CLARK'S FERRY BRIDGE CO. *v.* PUBLIC SERVICE
COMMISSION OF PENNSYLVANIA.

No. 274.   Argued January 18, 1934.—Decided February 5, 1934.

228

*Mr. George Ross Hull* for appellant.

: *Mr. E. Everett Mather, Jr.*, with whom *Mr. John Fox Weiss* was on the brief, for appellee.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

The Superior Court of Pennsylvania affirmed (as modified) an order of the Public Service Commission of that State prescribing a tariff of tolls to be charged on the bridge of the Clark's Ferry Bridge Company over the Susquehanna River, 108 Pa. Superior Ct. 49; 165 Atl. 261. The Company brings this appeal.

In its review of the facts the Superior Court states that the bridge is comparatively new, having been completed in May, 1925. The bridge replaced and was con-

structed near the site of a wooden bridge which had been acquired by the incorporators of the present Company. In August, 1925, a complaint was filed with the Public Service Commission alleging that the rates in effect were unreasonable. By its order of June 8, 1926, the Commission found the fair value of appellant's property to be $767,800 and that appellant was entitled to receive a gross annual revenue of $85,905, on the basis of a return of 7 per cent. on that fair value, after allowing operating expenses, taxes, an annual depreciation allowance, and amortization of bond discount. An appeal from the Commission's order was taken to the Superior Court, but was withdrawn, and in February, 1927, the Company filed a new tariff. The rates thus fixed were continued in effect until July, 1929, when the Company made a voluntary reduction. In January, 1930, the Commission began the present proceeding on its own motion and, after hearings, determined that the fair value of the appellants' property, as of February 2, 1932, was still $767,800, and that the annual gross revenue which should be allowed was $84,124 on the basis of a return of 7 per cent. on that fair value, after allowing expenses and annual depreciation. 11 Pa. P.S.C. 222.[1] In this calculation, an item of $1,331 for annual bond amortization was omitted. The Superior Court held that it should be included and modified the Commission's order accordingly, that is, so as to provide that the allowable gross revenue should be $85,455.

---

[1] The order of the Public Service Commission, of February 2, 1932, is as follows:

" That Clark's Ferry Bridge Company file, post and publish, effective thirty (30) days from date hereof, upon not less than one (1) day's notice to the public and this Commission, a new tariff calculated to produce an annual gross revenue of not more than $84,125.

" It is further ordered: That said tariff contain as tentative rates intended to produce said gross annual revenue of $84,125, and effective

*First.* Appellant contends that the Commission and the Court treated the valuation in the Commission's decision of 1926 as *res judicata* in the present proceeding. We do not so construe the Commission's report or the Court's opinion. The Commission received evidence as to alleged changes in value and estimates of the cost of reproducing the property. The Commission determined that " cost conditions " had not " changed materially " since 1926, and " upon a complete examination of the entire record in both proceedings " the Commission found that the fair value of the property was $767,800 as of February, 1932. 11 Pa.P.S.C. at p. 231. The Superior Court, in construing the action of the Commission, said: " When the subsequent complaints were filed, the Commission evidently did not consider its previous findings as barring appellant from raising the question of the fair value of its property in 1930 and the proper allowances to be made for operating expenses and depreciation, but instituted an investigation, and, as already stated, admitted in evidence appellant's reproduction cost estimate and its supporting testimony, and put in evidence the reproduction cost esti-

---

until further action by this Commission or the Company in conformity with said determination of allowable gross revenue the following charges:

"(1) A rate of 8 cents cash toll for all ordinary passenger automobiles and wagons now paying 10 cents. .

"(2) A ticket without time limit salable at the rate of two for 15 cents for all such automobiles and wagons.

"(3) A 20-trip ticket non-transferable as between vehicles good any time within thirty (30) days from date of issue and salable for one dollar ($1) for all such automobiles and wagons.

"(4) Rates for all other types of vehicles as are now provided in tariff P. S. C. Pa. No. 5.

" It is further ordered: That said Company file with this Commission monthly statements of income and operating expenses, showing the number of vehicles passing over its bridge in each class of traffic as contained in its tariff."

mate of one of its engineering staff, and the report of the result of an examination of appellant's books and records." The Court acted upon what it stated to be "the legislative mandate of the amendment of June 12, 1931, P.L. 530, that in an appeal of this character, we shall consider the record and 'on [our] own independent judgment . . . determine whether or not the findings made and the valuation and rates fixed by the Commission are reasonable and proper.' " . It was in this view that the Court examined the "main controversies" between the parties. 108 Pa. Superior Ct. at p. 63.

Appellant attacks the finding of fair value upon the grounds that it was based solely on the original cost of the bridge property and that the amount paid by the appellant for the bridge was less than its fair value at that time and less than its fair value in 1930. It is not open to question that the reasonable cost of the bridge is good evidence of its value at the time of construction. And we have said that "such actual cost will continue fairly well to measure the amount to be attributed to the physical elements of the property so long as there is no change in the level of applicable prices." *McCardle* v. *Indianapolis Water Co.*, 272 U.S. 400, 411; *Los Angeles Gas Co.* v. *Railroad Commission*, 289 U.S. 287, 306. In this instance, as the state court observed, the utility is not "a complicated system which has taken years to construct and enlarge, like a waterworks, or gas works, or electric light plant, or street railway system," but is "one structure, a reënforced concrete bridge, built as it now is, without additions or improvements." It appears that the bridge was built under a contract awarded in June, 1924, after competitive bidding, and was open to traffic in May, 1925. It is manifest that when the Commission made its first decision in June, 1926, the reasonable cost of the structure furnished a proper basis for determining its fair value. Of

the amount of the total valuation, at that time, of $767,800, the sum of $592,253 was taken as the construction cost on the basis of the actual outlay which included $566,301 paid to the contractor for the bridge and approaches. Appellant then insisted, and still insists, and it was shown, that the contractor sustained a loss. This was said to amount to about $143,000, that is, on labor and material, with overhead and depreciation of plant, as distinguished from a loss of profits. The evidence as to this was given by the contractor's auditor, who attributed the loss to an unusual flood. He said: "We would have made money probably if things would have gone along smoothly without any high water." The Court accepted this explanation—the only one given—stating that "A sudden rise in the Susquehanna River during the course of the work was responsible for the loss; without it there would have been a fair profit." The Court estimated that $20,000 additional, "spent on the coffer-dam construction," would probably have obviated the loss, adding—"We have increased the coffer-dam expense to cover this amount." Appellant complains that this statement was based on speculation and has no support in the record. But appellant's case is no stronger. The evidence gives no adequate ground for a conclusion that with reasonable care the loss could not have been prevented. The outstanding fact is that the contract was let in the usual way to the lowest bidder and the contractor received a substantial bonus ($22,050) for finishing the work before the stipulated date. To sustain the contention that the actual cost of the structure was less than a reasonable cost at the time, it was necessary for the appellant to give convincing proof. But such proof is lacking. We find no satisfactory basis for holding that the fair value of the property in June, 1926, was greater than $767,800 as it was then determined to be.

The question is whether the proof shows that the value was greater in 1932. Appellant relies upon the estimate of engineers as to the cost of reproduction new of the physical property, as of September 1, 1929, together with " all additional expenditures required over and above the bare cost of the physical property, to put the bridge in operation as an income-producing property." This estimate gave a total cost of reproduction new less depreciation (the estimate being exclusive of two other elements of alleged intangible value described as " attached business value " and " location value ") of $875,644.30. The Commission's engineer made a similar estimate based upon prices prevailing during the last three months of 1930, which gave the cost of reproduction new, less depreciation, as $741,871. There were also charts showing the price trends for labor and materials for 1924 to 1930, inclusive. As summarized by the Court, the evidence shows " that in 1924, when the contract for the construction of the bridge was awarded, construction prices were reported as being 215% of the 1913 level; that in September, 1929, when appellant's reproduction cost estimate was made, they were 208% of the 1913 level; and that during the last three months of 1930 they fell to about 198%." It would serve no useful purpose to review the details of the estimates of reproduction cost. The Court carefully considered them and properly concluded that the trend in prices from 1924–5, when the bridge was built, to 1931–2, when the Commission determined its present fair value, was " downward rather than upward," and that " in the absence of proof that the prices paid for the construction of the bridge were abnormally low there is no reason why in the short period of six years after its completion, with a tendency of prices for both material and labor being downward, there should be a radical increase in the fair value of the bridge for rate-making purposes." We agree with this conclusion.

It does not appear that the Court made any deduction from the amount of the fair value as determined in 1926 by reason of the depreciation accrued during the succeeding years. There was controversy as to the extent of that depreciation. Appellant's engineers allowed for the four and one-half years which had elapsed to the time of their survey the sum of $16,282. The Commission's engineer estimated the accrued depreciation for six years at $41,-403. The Court thought that the latter figure was " nearer the actual accrued depreciation than the estimate of the Company," but the Court apparently treated such accrued depreciation as largely off-set by the " extra allowance, over the contractor's bid, for concrete and coffer-dams." The Court decided that no harm was done the appellant by leaving the fair value at $767,800.

A distinct question is raised by a claim for what is called " the special value of location," in addition to the value of the bridge property thus far considered. This " special value " was put at $100,000. It was based, according to appellant's engineers, upon the advantage that the location of the bridge has over any other point for miles in either direction because the river is narrower and the conditions of the river bed are more favorable. The engineers made their estimate upon what they thought one would be willing to pay for the present site, in preference to other sites in the vicinity, because of the additional cost of building a bridge elsewhere. It appears that the bridge is located in a rural area. It was originally constructed as a part of an extensive transportation system built by the Commonwealth in the first half of the last century. As the Court pointed out, the right to operate a toll bridge across the river at this point or elsewhere " is fundamentally the gift of the Commonwealth, contained in appellant's franchise, and to attach a value

to it would be to capitalize the franchise contrary to the provisions of the statute and the frequent decisions of the courts." In building its new bridge, appellant took advantage of the traffic customs which had already been established. In the determination of the value of its property appellant was entitled to be allowed the fair market value of its real estate for all its available uses and purposes, which would include any element of value that it might have by reason of special adaptation to particular uses. But it was not entitled to an increase over this fair market value by virtue of the public use. *Minnesota Rate Cases*, 230 U.S. 352, 451, *et seq*. The evidence, so far as it was properly addressed to the question of the fair market value of appellant's real estate, tended to support the amount allowed in the estimate of fair value reached by the Commission and the Court, and afforded no basis for a higher valuation. There is no warrant for an increase of fair market value by reason of opinions as to what it would cost to build a bridge elsewhere.

We conclude that appellant has failed to show confiscation because of the amount used as a rate base.

*Second.* Appellant complains that the amount prescribed for gross revenue is inadequate. Appellant contests the annual allowance for depreciation and the rate at which the fair return is calculated.

The Commission fixed the annual depreciation allowance at $7,678 and the Court approved it. This amount equals one per cent. of the fair value. Appellant contends that the allowance should be 2½ per cent. of the value of the depreciable property on the straight line basis. The difference—on appellant's calculation of the fair value— amounts to $13,434. The Court approved the ruling of the Commission.

There is no question as to the fact of depreciation. It was established, as respondent admits, that concrete

bridges deteriorate from the moment of their completion; that there are chemical changes in their structure, absorptions of moisture and oxidation, both within the concrete and in the reënforcing iron covered by it, which cannot be stopped in their process or their effects removed. With this understanding, the question is as to the amount which should annually be allowed which will serve adequately to protect the investment from impairment due to age and use. Testimony was given by one of appellant's engineers that the average life of a concrete bridge was from 30 to 50 years; by another, that the period for which this bridge might be expected to remain useful was " from 40 to 80 years,"—he " would not figure on over 40." Another testified that physically the bridge " might have a life of 50 to 100 years." The Commission's engineer estimated its life at from 40 to 50 years; for his computation he took an expectancy of 45 years. Respondent urges that the annual allowance asked by appellant was plainly too large and contrasts it with appellant's claim for accrued depreciation; that is, as the Court stated, appellant's engineers " allow an accrued depreciation for the four and a half years elapsing to the time of their survey of $16,282, but claim a *yearly* depreciation allowance thereafter of $21,210." While it is recognized that accrued depreciation, as it may be observed and estimated at a given time, and an appropriate allowance of depreciation according to good accounting practice, need not be the same, there is no rule which requires an allowance to be made or continued which in the light of experience is shown to be extravagant. *Smith* v. *Illinois Bell Telephone Co.*, 282 U.S. 133, 158. After reviewing the testimony, and the methods of calculation which the parties respectively advocated, the Court thus stated its conclusion: " It [the Commission] allowed $7,678 annually. This sum set aside each year, with 4% *simple* interest will

in fifty years produce approximately $767,800, sufficient to rebuild the bridge as now valued. The straight line method advocated by the Company will in fifty years with 4% simple interest produce a fund twice as great as that necessary to replace the bridge. The straight line method is often used for short-lived structures, or plants of a character that they can be restored from time to time to the original condition of efficiency. . . . It is not so fair or equitable when applied to a long-lived structure or one that is disintegrating gradually and continuously and not capable of being restored to its original condition. The company may not be required to apply the income received from the depreciation fund to make up any deficit of operation (*Board of Public Utility Comm'rs* v. *New York Telephone Co.*, 271 U.S. 23), but it is not entitled to an allowance, which exclusive of interest earned on the fund, will be sufficient to rebuild the bridge, when its life is done, but only to such an allowance as will with reasonable interest added make a fund sufficient to replace the bridge when it requires replacement." In this view, the Court thought the amount allowed by the Commission to be "fair and reasonable in the circumstances." The Court added that the Commission had included in its allowance for operating expenses an item of $1,800 for "maintenance."

The question of the amount which should be allowed annually for depreciation is a question of fact. *Georgia Railway & Power Co.* v. *Railroad Commission*, 262 U.S. 625, 633. In reviewing the findings of the state court we are not required to enter a debatable field of fact and to choose and prescribe an invariable method of computation. To justify the overruling of the determination of the state court we must be able to see that what has been done will produce the result which the Constitution forbids. Considering the nature of the property, and upon facts shown by the evidence, the state court has allowed

appellant to reserve annually, and use for its own purposes, an amount which according to common experience may be expected to produce a sum adequate to replace the property on the expiration of its life. We find it impossible to say, from a constitutional standpoint, that another method should have been employed or a greater amount allowed.

Appellant also insists that it is entitled to a rate of return of nine per cent. upon the fair value of its property. The Commission and the court decided that seven per cent. was sufficient. We perceive no constitutional ground for complaint on that score. *Wabash Valley Electric Co.* v. *Young*, 287 U.S. 488, 502; *Los Angeles Gas & Electric Corp.* v. *Railroad Commission*, 289 U.S. 287, 319, 320.

*Third.* The final attack is on the form of the Commission's order. The Commission fixed the amount of the annual gross revenue and then prescribed a tentative schedule of rates.[2] Appellant says that it is obvious that no one can tell in advance how many vehicles of different tariff classifications will pass over the bridge in a year and what annual gross revenue will be produced by a given schedule of rates. But, as the prescribed rates are expressly stated to be tentative, there is no ground for assuming that the Commission will reject an application to make such changes in the schedule as experience may show to be necessary in order to produce the stipulated revenue. There is nothing in the order which requires that the test period should be a year or any definite time. From the statements at the bar it appears that appellant has not put the tentative schedule in effect and has made no application to the Commission for a change in the schedule. If the allowance of gross revenue is adequate, as it has been found to be, there is no basis for complaint

---

[2] See Note 1.

242

because of a schedule of rates which on application may be appropriately modified.

The judgment of the Superior Court of Pennsylvania is
*Affirmed.*