**UNITED STATES**
v.
**44 ACRES OF LAND IN COUNTY OF BERKELEY, SOUTH CAROLINA et al.**

Civ. No. 2888.

United States District Court,
E. D. South Carolina
Charleston.

May 20, 1954.

⟸205

N. Welch Morrisette, Jr., Yancey A. McLeod, Columbia, S. C., for plaintiff.

Charles W. Waring, Charleston, S. C., for defendants.

WILLIAMS, District Judge.

On the 19th day of August, 1953, E. W. Mullins of Columbia, South Carolina, J. E. Dudley, of Bennettsville, South Carolina, and Mr. Arthur M. Field of Charleston, South Carolina, were appointed in pursuance of subdivision (h) of Rule 71A of the Federal Rules of Civil Procedure, 28 U.S.C.A., as commissioners with instructions to fix the fair market value at the time of the taking of the land in question. A Majority Report has been filed by E. W. Mullins, Chairman, and J. E. Dudley, and a Minority Report by Arthur M. Field. A Supplemental Report was also filed by E. W. Mullins and J. E. Dudley. The Majority Report and the Supplemental Report are comprehensive and meet with my approval. The Majority Report and Supplemental Report contain a most excellent statement of facts and conclusions of law, and I hereby adopt the said Reports as the Order of the Court.

The Majority Report is as follows:

"Pursuant to our appointment as Commissioners under the order of the Honorable Ashton H. Williams, United States District Judge, dated August 19, 1953, we, the undersigned Commissioners, beg leave to report as follows:

"Following our appointment a preliminary conference was held in Columbia, South Carolina, in the nature of a pre-trial conference, attended by counsel of record, and thereafter a hearing was held in the United States District Court Room in Charleston, South Carolina,

lasting three full days, at which time a very substantial amount of evidence was taken, together with numerous exhibits which were introduced both by the Government and the land owner. The premises being condemned, to wit, the 44 acres, together with the other adjacent property of the West Virginia Pulp and Paper Company, were inspected by the Commissioners. Subsequently, on January 15, 1954, the matter was argued orally before the Commissioners in Columbia, South Carolina, and in addition to the oral arguments the Commissioners have had the benefit of very able briefs by Council representing both parties. The arguments and the consideration of the case consumed an entire day and subsequently the Commissioners had a meeting in Columbia on Monday, February 15, 1954, at which time the evidence and the record were carefully reviewed and discussed.

"The record of the proceedings before these Commissioners and the exhibits introduced in evidence are herewith submitted with this report.

"We find that on September 17, 1951 the United States took 44 acres of land belonging to West Virginia Pulp and Paper Company, which was taken to provide a site for the storage of gasoline for the Air Force. The acreage taken is situate in Berkeley County, South Carolina, and is a part of the property acquired by West Virginia Pulp and Paper Company for the construction of its mill and for the expansion of its manufacturing operations. The 44 acres taken is part of a 154 acre tract acquired by the Company in 1936 and combine, with adjacent tracts, into one tract of approximately 413 acres, which was being held as a site for a pulp dissolving mill which the Company was preparing to build on its plant near the Cooper River. The plant of the West Virginia Pulp and Paper Company was located on a tract of land which fronted on the Cooper River, but the evidence in this dealt largely, if not entirely, with the tract of 375 acres north of Cosgrove (Remount Avenue) in which the 44 acres was included.

"The first question to be determined by the Commissioners in this action is the fair market value of land taken, and, second, any depreciation (severance damage) to the remainder (of the property) due to the use made of the part taken.

"The right of the Government to take the 44 acres from the defendant, in the exercise of its power of eminent domain, is unquestioned, but the exercise of such power is subject to the limitation imposed by the Fifth Amendment that 'private property [shall not] be taken for public use, without just compensation.' As was said by the Supreme Court in United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 279, 87 L.Ed. 336:

" 'The Fifth Amendment of the Constitution provides that private property shall not be taken for public use without just compensation. Such compensation means the full and perfect equivalent in money of the property taken. The owner is to be put in as good position pecuniarily as he would have occupied if his property had not been taken.

" 'It is conceivable that an owner's indemnity should be measured in various ways depending upon the circumstances of each case and that no general formula should be used for the purpose. In an effort, however, to find some practical standard, the courts early adopted, and have retained, the concept of market value. The owner has been said to be entitled to the "value", the "market value", and the "fair market value" of what is taken. The term "fair" hardly adds anything to the phrase "market value", which denotes what "it fairly may be believed that a purchaser in fair market conditions would have given", or, more concisely, "market value fairly determined".

" 'Respondents correctly say that value is to be ascertained as of the date of taking. But they insist that no element which goes to make up value as at that moment is to be dis-

carded or eliminated. We think the proposition is too broadly stated. Where, for any reason, property has no market resort must be had to other data to ascertain its value; and, even in the ordinary case, assessment of market value involves the use of assumptions, which make it unlikely that the appraisal will reflect true value with nicety. It is usually said that market value is what a willing buyer would pay in cash to a willing seller. Where the property taken, and that in its vicinity, has not in fact been sold within recent times, or in significant amounts, the application of this concept involves, at best, a guess by informed persons.

" 'Again, strict adherence to the criterion of market value may involve inclusion of elements which, though they affect such value, must in fairness be eliminated in a condemnation case, as where the formula is attempted to be applied as between an owner who may not want to part with his land because of its special adaptability to his own use, and a taker who needs the land because of its peculiar fitness for the taker's purposes. These elements must be disregarded by the fact finding body in arriving at "fair" market value.'

"In considering the question of just compensation, the Supreme Court of the United States, in Olson v. United States, 292 U.S. 246, 54 S.Ct. 704, 708, 76 L.Ed. 1236, says:

" 'Just compensation includes all elements of value that inhere in the property, but it does not exceed market value fairly determined. The sum required to be paid the owner does not depend upon the uses to which he has devoted his land but is to be arrived at upon just consideration of all the uses for which it is suitable. The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near fu-

ture is to be considered, not necessarily as the measure of value, but to the full extent that the prospect of demand for such use affects the market value while the property is privately held. Mississippi & R. R. Boom Co. v. Patterson, 98 U.S. 403, 408, 25 L.Ed. 206; Clark's Ferry Bridge Co. v. Public Service Commission, 291 U.S. 227, 54 S.Ct. 427, 78 L.Ed. 767; 2 Lewis, Eminent Domain (3d Ed.) § 707, p. 1233; 1 Nichols, Eminent Domain (2d Ed.) § 220, p. 671. The fact that the most profitable use of a parcel can be made only in combination with other lands does not necessarily exclude that use from consideration if the possibility of combination is reasonably sufficient to affect market value. Nor does the fact that it may be or is being acquired by eminent domain negative consideration of availability for use in the public service. [City of] New York v. Sage, 239 U.S. 57, 61, 36 S.Ct. 25, 60 L.Ed. 143. * * *

" 'In respect of each item of property that value may be deemed to be the sum which, considering all the circumstances, could have been obtained for it; that is, the amount that in all probability would have been arrived at by fair negotiations between an owner willing to sell and a purchaser desiring to buy.'

"In endeavoring to arrive at market value it must always be borne in mind that the test of market value is objective. As said by the Court of Appeals for the First Circuit, in Baetjer v. United States, 143 F.2d 391, at page 396:

" 'The rule is well established that market "value may reflect not only the use to which the property is presently devoted but also that use to which it may be readily converted." United States [ex rel. and for Use of Tennessee Valley Authority] v. Powelson, 319 U.S. 266, 275, 63 S.Ct. 1047, 1053, 87 L.Ed. 1390; Boom Co. v. Patterson, 98 U.S. 403,

408, 25 L.Ed. 206. But it does not follow from this that its value to the condemnee, even if more valuable to him than to anyone else, is the criterion. The test of market value is objective. It is what a hypothetical willing seller would part with the land for and what an equally hypothetical buyer would give for it. Value due to the stragic [sic] location of land is important, but important only in so far as that factor would influence the hypothetocal [sic] bargainers whose behavior provides the test of value, and this, we think, is all the Supreme Court meant when it followed the above quotation from the Powelson case with the statement that "value may be determined in light of the special or higher use of the land when combined with other parcels; it need not be measured merely by the use to which the land is or can be put as a separate tract." We see no conflict between this statement and the statement in the Miller case, (317 U.S. at page 375, 63 S.Ct. at page 280, 87 L.Ed. 336, 147 A.L.R. 55) to the effect that the fact that an owner "may not want to part with his land because of its special adaptability to his own use * * * must be disregarded by the fact finding body in arriving at 'fair' market value." This latter quotation seems to us applicable to the situation presented by the facts in the case at bar and determinative of this contention of the appellants. See United States v. Honolulu Plantation Co., 9 Cir., 122 F. 581, 585.'

"The Commissioners have considered numerous other authorities defining just compensation, market value and the measure of damages, and have reached the conclusion that the determination of just compensation is a matter of judgment to be determined after considering and evaluating all of the evidence; and, of course, sound judgment varies just as individuals vary in their opinion.

"As stated by Mr. Justice Jackson, in his dissenting opinion, in United States Ex rel. Tennessee Valley Authority v. Powelson, 319 U.S. 266, 63 S.Ct. 1047, 1059, 87 L.Ed. 1390:

"'Determination of the value or property, particularly as affected by a prospective use, always involves some element of prophecy and some estimation of probabilities.'

■ "There was ample testimony, and we so find, that the highest and best use of the entire property of which the 44 acres are a part would be for one or more industrial sites, such as would be required by pulp dissolving plants, paper mills, rubber manufacturers, oil refineries, and certain other industries.

■ "It is well settled in condemnation proceedings that the highest and most profitable use for which the property is adaptable and needed, or likely to be needed in the reasonably near future, is to be considered. It was so held by the Supreme Court in the Olson case, supra, and by the Court of Appeals for the Fourth Circuit, when this case was before it. See West Virginia Pulp & Paper Co. v. United States, 4 Cir., 200 F.2d 100.

"Of course it is well settled that the value of the land taken is to be determined as of the date of taking, which in this case is September 17, 1951.

"As heretofore said a large amount of evidence is before the Commissioners; and in order that the recommendation of the Commissioners may be clearly understood, we believe it advisable to summarize the facts in some detail.

"The landowner in presenting his case offered a total of five witnesses. The first of these, Mr. Herman J. Williams, a civil engineer in the employ of West Virginia Pulp and Paper Company, presented in evidence a large area map reflecting the industrial holdings of that company in the immediate vicinity of the subject tract. These consist of the original plant site on the Cooper River containing 226 acres and the 413 acre

area lying west of the Seaboard Air Line Railroad. Of these lands our immediate concern is with the 375 acre area lying west of the railroad and north of Cosgrove Avenue—Remount Road. The 44 acres at issue was carved from the extreme northeastern corner of this 375 acre area. Mr. Williams identified on the map and gave a general description of the various physical characteristics of these lands.

"Mr. L. Frank Thompson, Resident Manager of the Charleston Mill of the West Virginia Pulp and Paper Company, gave a general account of the activities growth of the Charleston Mill since its establishment in 1936 and of its acquisition during that year of the 413 acre area west of the railroad at a price of about $10,000.00. He also described in some detail the physical characteristics of these properties and placed particular stress upon the 48 inch raw water line which traverses the southern portion of the 375 acre tract north of Remount Road. Mr. Thompson also outlined the prospective plans of the company to utimately expand its industrial operation over into this 375 acres. The issue regarding this contemplated expansion however becomes academic in view of the later concession that the taking of the 44 acres resulted in no distortion and that ample space still remained for any such future expansion.

"The landowner next offered Mr. Pierce Davis of Boston, Massachusetts, who was identified as the Chief Engineer for Arkwright Insurance Company, a member of the Factory Mutual Group, which has the fire insurance coverage on all West Virginia holdings throughout the nation. Mr. Pierce's testimony was confined for the most part to the effect which he considered the use of this 44 acres by the government as a storage facility for high octane gasoline and jet fuel would have upon the adjacent lands of the claimant. He expressed the opinion that within a distance of 500 feet from the nearest dyke installation, because of the danger of fire from radiant heat, no construction except that of the most fire proof and expensive type would be feasible and that from a distance of 500 feet to 1000 feet, because of the fire hazard involved, a much more expensive type of construction and fire preventive facilities would be required than would obtain under ordinary conditions were the installation not present. The first of these distance coordinates was shown by an overlay map presented in evidence to embrace a total of 18.8 acres and the second an area of 41 acres, all of which was owned by the claimant. He also testified that very substantial increases in construction costs would be required in order to protect against and overcome the hazards within these respective areas caused by the presence of the government facility. Mr. Davis further testified that aside from these added construction costs, and presupposing that his company's requirements regarding such construction and protective measures had been complied with, there would still be a rate penalty within the area for insurance purposes of 20 per cent. He estimated that this rent penalty applied to a conjectured million three hundred thousand square feet of construction would amount to $4,000.00 per year. Mr. Davis was the only witness offered by the landowner on the issue of whether a hazard to adjacent properties had actually been created by the government's use of the 44 acres. It is of some significance that he had not made a closeup inspection of the large storage tanks in question and did not know whether they contained floating roofs or the stationary cone shaped type of roofs.

"The landowner offered two evaluation witnesses. The first of these, Mr. Lee S. Cole of Atlanta, Georgia, was shown to have had considerable experience in the appraisal field, as a member of the American Institute of Real Estate Appraisers, and from time to time had done appraisal work for the government. This witness gave an analytical account of various sales made within the Charleston Area of industrial site properties which he considered in some degree com-

parable to the subject property and described in some detail the physical characteristics of the property and particularly the facilities available to it. Relying strongly upon the sale of what was identified as the Hewitt property, located on the deep water channel of Cooper River, which had recently sold for a price of $3519 per acre, he expressed the opinion that this 44 acre tract, valued as an integral part of the 375 acres had a fair market value, aside from severance damages, of $3,000 per acre or a total of $132,000. Without asserting any independent knowledge with respect thereto he then gave his opinion as to the extent to which the 18.8 acres and the 41 acres overlay areas had been depreciated in market value by reason of the presence and use by the government of this storage facility installation. Mr. Cole had previously testified that there was no damage to the remaining land by reason of distortion since ample space would remain for its use as industrial sites by one and possibly two heavy industries. He also conceded under cross-examination that if there was no hazard to adjacent property there would be no severance damage of any nature. Mr. Cole assumed the assertions by the witness Davis to be correct and reliable and upon that premise testified that, in his opinion, the 18.8 acre area had been reduced in value at the rate of $2400 per acre for a total of $45,120 and that the 41 acre area had been reduced in value at the rate of $1400 per acre for a total of $61,500, amounting to a total in severance damages of $106,620. Upon adding his fair market value and his severance damages, he expressed an overall just compensation figure of $238,620.

"The other valuation witness for the landowner, Mr. John J. Owens, who is associated with a Charleston real estate firm, followed generally the line of testimony as given by Mr. Cole and expressed the opinion that this 44 acres considered as a part of the 375 acre area had a fair market value of $3500 per acre, or a total of $154,000, to which he added severance damages, in like manner predicted upon

the testimony of Mr. Davis, of $3150 per acre for the 18.8 acre area which totalled $59,220 and $1750 per acre for the 41 acres which amounted to $71,750 or a total of $130,970 severance damages resulting from hazard. He then added his fair market value and severance damage figures and reached an overall just compensation figure of $285,000. This witness also conceded that there was no distortion damage to the remainder and that unless a hazard was created by this installation there was no severance damage of any nature to the remaining property.

"In the presentment of its case the government offered testimony by six witnesses. The first of these, Mr. L. D. Singleton, a Charleston representative of the South Carolina Rating and Inspection Bureau, testified that under the regulations of his rating agency there was no exposure or penalty charge for structures situated more than 100 feet from an installation of this type irrespective of the size or number of tanks. And further, that such storage tanks themselves carried a substantially lower rate for insurance than ordinary factory buildings.

"Mr. Claude S. Hart, an appraiser with the Savannah office of the Corps of Engineers, who was shown to have had long experience in the appraisal field, testified that he made a joint appraisal of the subject tract with Mr. W. E. Fort, Chief Appraiser for that office. He enumerated various sales in the Charleston locality of lands which he considered comparable to this property and which served as one of the bases upon which he formed his opinion as to its fair market value. After describing the various characteristics of this property he expressed the opinion that there were no severance damages to the remainder and gave as his just compensation figure the sum of $1000 per acre for the 44 acres, or a total of $44,000. This witness also testified that he had personally measured the respective distances of the nearest tank and enclosing dykes to the property lines of the landowner and that these

distances were as follows: on the south side the nearest dyke, measured from the top, was 208 feet from the property line as represented by the enclosing fence and the nearest tank was 308 feet therefrom; and, on the west side, the nearest dyke was at a distance of 147 feet, and the nearest tank a distance of 247 feet, from the West Virginia property line, Rhett Avenue having a width of 70 feet intervening. This witness also testified that as a preliminary to this acquisition by the government he made an appraisal of the Hewitt property just a few weeks before he made his appraisal of the instant tract. At that time the government had under consideration the prospective purchase of the Hewitt property but later determined to acquire this 44 acres instead. At that time Mr. Hart stated he appraised the Hewitt property at about $3200 or $3300 per acre but that he did not consider the two as being comparable to any real degree for the reason that the Hewitt property was located on the deep river channel of Cooper River, whereas this tract was situated about 2 miles therefrom. The testimony of the witness Fort confirmed the joint appraisal as made by him and the witness Hart.

"Next presented was testimony by Mr. H. E. Rivers and Mr. Stephen F. Shackelford, each of whom is engaged in the real estate business in Charleston and was shown to have had long experience with appraisals in that area and a familiarity with real estate properties in that area. These witnesses made a joint appraisal and respectively testified that they did not consider the remaining properties as having been impaired in any way by the taking and that there were no severance damages. Each expressed the opinion that the 44 acre tract at the time of its taking had a fair market value of $38,-500. This figure was inclusive of some timber which was on the tract at the time of its taking but had been cut and removed prior to their joint appraisal. The witness Hart had made a cruise of this timber and these witnesses accepted his timber valuation and included it as a part of their total just compensation figure. Each of these witnesses described in considerable detail various sales of other lands in this general locality which they considered comparable to this property. With respect to the 48 inch raw water line which crosses the lower portion of the 375 acres, Mr. Rivers testified that he considered its presence in making his appraisal but also considered the fact that it was about 1900 feet from the 44 acres, that it was privately owned by the West Virginia Pulp and Paper Company, that that company had the exclusive right to the use of that water and that a prospective purchaser could use it only by West Virginia sufferance. Mr. Shackelford concurred generally in these views expressed by Mr. Rivers.

"As its last witness the government offered Mr. Edgar W. Murr, a civilian engineer with the Army Air Force who has general supervision over this and about 86 other similar installations. Through the medium of this witness there were introduced as government exhibits Specifications (for tank construction) as promulgated by the American Petroleum Institute (Gov't's Exhibit 4); Recommended Good Practice for Safeguarding Flammable Liquids, Storage and Processing as promulgated and published by the Factory Insurance Association (Gov't's Exhibit 5) and Standards of the National Board of Fire Underwriters for the Storage, Handling, and Use of Flammable Liquids, NDFU Phamphlet No. 30 (Gov't's Exhibit No. 6). The following excerp [sic] from the exhibit last mentioned (National Board of Fire Underwriters) is considered of some significance:

'Tanks with capacities in excess of 50,000 gallons and all tanks for storage of crude petroleum shall be located in accordance with the following provisions:

"'Group A Tanks. Any all-steel, gas-tight tank constructed in compliance with these or equivalent standards and equipped either with (1) an approved permanently attached extinguishing system or (2)

an approved floating roof, which is is to be used only for the storage of a refined petroleum products or other flammable liquids not subject to boil-over, shall be so located that the distance from the line of adjoining property which may be built upon shall be not less than the greatest dimension of diameter or height of the tank, except that such distance need not exceed 120 feet.'

"The witness Murr testified that this facility was constructed in strict accordance with, and in many instances surpassing, the specifications and standards as outlined in the foregoing exhibits; that each tank is equipped with the most modern type of floating roof, thereby eliminating any air space within the tank and obviating the necessity for any fixed foam devices; that an appropriate dyke surrounds each tank which goes beyond the prescribed standard and is designed to contain one and one-half times the contents of the tank; that the fuel value of each tank when full amounts to more than $800,000 and that the tank was carefully designed to retain this fuel without breach; that this installation is fully equipped with all necessary safety devices and is regarded by him as the most modern and safest one under his supervision; that the use of a floating roof negatives the possibility of an explosion and that any fire which might break out within the tank would be confined to a 'lamp wick' type of burning at the top which could be readily and easily controlled. He further testified, in rebuttal to the testimony offered by Mr. Davis, that any sudden collapse of the tank with a resulting washing out of the retaining dyke was not within the realm of the practical possibility for the reason that these tanks were constructed with a large margin of safety and that he had never experienced or had knowledge of any such sudden and giving way of a tank, and expressed the ultimate conclusion that there was no hazard to adjacent properties created by the presence and use of this storage.

"As will be readily observed from a resume of the testimony there is a vast difference of opinion between the landowner's witnesses and those of the Government, both with respect to the value of the land taken and the severance damage, if any. We believe that the Government's witnesses have not given sufficient effect to the adaptability of the property as a site for a heavy-water-using industry, and, on the other hand, it is equally clear to us that the expert witnesses on behalf of the landowner have given undue weight to the adaptability of the property as a heavy-water-using industry and have considerably exaggerated its market value as of September 17, 1951.

"This wide range of estimates as to value presents a very difficult problem for the Commissioners but, in our opinion, it is one that we can and should solve. We commence by saying that we do not accept in full the opinion testimony of either the landowner's witnesses or those for the Government, with respect to the value of the land taken.

"In considering this problem we have in mind what was said by Judge Parker in United States ex rel. Tennessee Valley Authority v. Powelson, 4 Cir., 118 F.2d 79, 85. Reversed on other grounds. 319 U.S. 266, 63 S.Ct. 1047, 87 L.Ed. 1390. Said he:

'The peculiar difficulty of the case arises out of the fact that neither the expert testimony relied upon by respondent nor that relied upon by petitioner can be accepted in its entirety in fixing values, and the other opinion evidence as to value ignores very largely the availability of the property for water power purposes. Under such circumstances, the duty devolved upon the court of determining the true value as best it could from the facts before it. In performing this duty it made an estimate of the per acre value of the lands actually available for power purposes and of those not so available; and the contention is made

that because the valuations adopted by the court do not correspond to the testimony of any witness they are without support in the evidence. We are not impressed by this contention. The court was not bound to accept the opinion of any of the experts or other witnesses as to value, but was charged with the duty of determining that question from all the testimony considered in the light of the court's general knowledge. Dayton Power & Light Co. v. Public Utilities Comm., 292 U.S. 290, 299, 54 S.Ct. 647, 78 L.Ed. 1267; The Conqueror, 166 U.S. 110, 131, 133, 17 S.Ct. 510, 41 L.Ed. 937; Head v. Hargrave, 105 U.S. 45, 49, 26 L.Ed. 1028; Anchor Co. v. Com'r, 4 Cir., 42 F.2d 99, 100; Bourne v. Com'r, 4 Cir., 62 F.2d 648, 650; Gamble v. Com'r, 6 Cir., 101 F.2d 565, 567. What was said by Mr. Justice Field in Head v. Hargrave, supra, as to the duty of the jury with respect to expert testimony as to value, is applicable to the duty of the court here. Said he (105 U.S. 49, 26 L.Ed. 1028): "The evidence of experts as to the value of professional services does not differ, in principle, from such evidence as to the value of labor in other departments of business, or as to the value of property. So far from laying aside their own general knowledge and ideas, the jury should have applied that knowledge and those ideas to the matters of fact in evidence in determining the weight to be given to the opinions expressed; and it was only in that way that they could arrive at a just conclusion. While they cannot act in any case upon particular facts material to its disposition resting in their private knowledge, but should be governed by the evidence adduced, they may, and to act intelligently they must, judge of the weight and force of that evidence by their own general knowledge of the subject of inquiry." '

"As we have heretofore said, this Commission is of the opinion that the value of the land taken from the defendant in this action would be affected by its potential capability for use as a site or sites for heavy-water-using industries, the taken land being capable of being used for such purposes either by itself or in conjunction with other lands of defendant which would readily be available for such purposes, and that such use should be considered as one of the elements which go to determine the fair market value of the taken land. However, in considering the value of these lands on the basis of their potentiality as a site or sites for heavy-water-using industries the Commission must take into consideration the fact that there was no testimony, certainly none of a convincing nature, that there was a potential purchaser for the lands in question on September 17, 1951 or up to the time of the hearing. On the other hand, the fact that the land or lands of the West Virginia Pulp and Paper Company did have such potential use does have an effect in determining the fair market value.

"In connection with the opinion evidence as to value, there was considerable testimony as to sales of similar or somewhat similar tracts of land. Unfortunately none of these sales were of land of exactly the same type as the land being condemned, but we have endeavored to weigh this testimony and give it such weight as it deserves. In considering the evidence as to similar sales we have had in mind what is said in Nichols on Eminent Domain, 4th Vol., page 59, as follows:

'It must be remembered, however, that the comparison is made with lands which are *similar* to the land taken. Of course, since, in fact, no two parcels are exactly alike, only such parcels may be compared where the dissimilarities are reduced to a minimum and allowance is made for such dissimilarities. It is, there-

fore, imperative to consider such differences as may exist in the physical and environmental conditions and a proper allowance made to cover any differential that may exist by virtue of the difference in the time of the sales. It is evident that there may be considerable difference in the size, shape, situation, and immediate surroundings of two estates, and perhaps in other respects, and yet the price which one brought may be of substantial assistance in determining the value of the other. There may be general considerations applicable to both alike which largely affect their value and render it proper that the price paid for one should be considered in arriving at the value of the other, notwithstanding the differences between them.'

■ "Next, as to the question of severance damage, it is well settled that:

'The burden of proof is upon the owner to show that the taking of part of his property will cause damage to the remainder, and unless he shows such damage by affirmative evidence, furnishing a basis from which a reasonable and proper estimate of the amount thereof can be made, his compensation will be limited to the value of the land taken. It is, of course, competent for the condemnor to rebut such evidence.' Nichols, Vol. 4, page 316.

■ "The testimony offered by the land owner with respect to the damage which it claims to have been caused to the remainder of its property is neither satisfactory nor convincing. We do take into consideration, however, the fact that there might be some danger of fire damage, although very remote, which would be taken into consideration by a willing purchaser who was contemplating the purchase of the remaining property of the West Virginia Pulp and Paper Com-

pany. We have also taken into consideration the fact that a purchaser of the remaining property of the West Virginia Pulp and Paper Company who purchased the same for use as a site for a heavy-water-using industry would not necessarily decide to locate its plant or other principal building immediately adjacent to the boundary line between the property purchased and the 44 acres taken by the government. Of course a purchaser of property has the right to use it for any lawful purpose, but in attempting to determine what severance damage, if any, has been occasioned to the remaining property of the defendant we have endeavored to consider all elements which we think would be considered by a willing purchaser as well as a willing seller.

■ "After due consideration of all the evidence before it and having regard to the various elements that should be considered in arriving at the fair market value of the land taken from defendant in this proceeding, which is the just compensation to which the said defendant is entitled, this Commission is of the opinion that defendant is entitled, this Commission is of the opinion that defendant is entitled to the sum of seventy thousand ($70,000) dollars. In other words, we believe and find that the difference between the fair market value of the whole (the 375 acre tract) before the taking of the 44 acres, and the fair market value of what remained after the taking was and is the sum of seventy thousand ($70,000) dollars.

"In arriving at this conclusion the Commission has considered that this sum affords the defendant just compensation not only for the 44 acres of land actually taken from it, but also for the severance damage to the remaining tract or tracts of land adjacent thereto.

"The Commission is not advised as to what deposits have been made by the

Government in payment of this property and as to what disposition, if any, has been made thereof. We therefore recommend that judgment be given the condemnee consistent with the findings herein made.

"Commissioner Arthur Field declined to join in this report—This report is therefore the report of the majority of the Commission."

The Supplemental Report is as follows:

"Pursuant to the request of the Court that we make a supplemental report and state the amount of severage [sic] damages which we have found, we, the undersigned Commissioners, beg to report as follows:

"As stated in our original report dated February 18, 1954, we concluded from the evidence that the danger of fire damage to the remaining property of the West Virginia Pulp & Paper Company, which was the only element of severance damages, was very remote, but that a willing purchaser might give some consideration even to this remote possibility. After again reviewing all the evidence with respect to the severance damages claimed in this case and having in mind the principles set forth in our original report, it is our opinion that the severance damage should be and is hereby fixed at five thousand ($5,000) dollars. We further find that the fair market value of the 44 acres taken as of September 17, 1951 is the sum of sixty-five thousand ($65,000) dollars. In other words, we find that just compensation for the 44 acres of land actually taken is the sum of sixty-five thousand ($65,000) dollars and the severance damage to the remaining tract or tracts of land adjacent thereto is the sum of five thousand ($5,000) dollars."

For the reasons given in the foregoing excellent Reports, the said Reports are hereby approved, adopted and made the Order of this Court.