UNITED STATES of America,
Appellant,

v.

STATE OF SOUTH DAKOTA GAME, FISH AND PARKS DEPARTMENT, Izaak Walton League, Boy Scouts of America, Girl Scouts of America and Pierre Country Club, Appellees.

No. 17354.

United States Court of Appeals
Eighth Circuit.

April 8, 1964.

Rehearing Denied May 19, 1964.

Edmund B. Clark, Atty., Dept. of Justice, Lands Division, Washington, D. C., made argument for appellant and Ramsey Clark, Asst. Atty. Gen., Washington, D. C., Harold C. Doyle, U. S. Atty., John L. Wilds, Asst. U. S. Atty., Sioux Falls, S. D., and Roger P. Marquis, Atty., Dept. of Justice, Washington, D. C., were with him on the brief.

John B. Wehde, Asst. Atty. Gen., State of South Dakota made argument for State of South Dakota and Warren W. May of Martens, Goldsmith, May & Porter, Pierre, S. D., made argument for lessee defendants-appellees. Frank L. Farrar, Atty. Gen., State of South Dakota; Fred Hendrickson, Asst. Atty. Gen., State of South Dakota were with them on the brief.

Before VAN OOSTERHOUT and BLACKMUN, Circuit Judges, and DAVIES, District Judge.

RONALD N. DAVIES, District Judge.

This case reaches us on appeal from a judgment rendered in the United States District Court of South Dakota in eminent domain proceedings in which 848.26 acres of land had been taken and for which a jury awarded appellees a total of $1,062,250.00. Jurisdiction in the court below was invested under 28 U.S.C. § 1358. Jurisdiction in this court is based upon 28 U.S.C. § 1291.

There is here involved the condemnation of the indicated acreage of South Dakota land in conjunction with the Big Bend Reservoir project. The area is commonly described as Farm Island and has for a long time been used as a public park. Although the realty was originally an island in the Missouri river, it has been connected at both ends to the mainland by fill and accretion, thus forming a body of water between the connecting strips called Hipple Lake. The nature of the State's interest is adequately recited in appellant's brief, but we set out

so much thereof here as may be necessary to an understanding of it.

By an 1889 Act of Congress, 25 Stat. 888, there was ended a series of negotiations with Sioux Indians which provided for a division of the Sioux Reservation and opened the lands to entry, with the exception of three islands in the Missouri which were withheld from entry in identical terms. The provision for Farm Island was as follows (p. 897):

> "Farm Island, an island in the Missouri River near Pierre, in the Territory of Dakota, and now a part of the Sioux Reservation, is hereby donated to the said city of Pierre: *Provided further,* That said city of Pierre shall formally accept the same within one year from the passage of this act, upon the express condition that the same shall be preserved and used for all time entire as a public park, and for no other purpose, to which all persons shall have free access; and said city shall have authority to adopt all proper rules and regulations for the improvement and care of said park; and upon the failure of any of said conditions the said island shall revert to the United States, to be disposed of by future legislation only."

In 1937 by Act of Congress, 50 Stat. 648, Farm Island was designated as a Wild Game Refuge and provision was made for criminal penalties for violation of provisions of the Act. In June of 1940, 54 Stat. 405, the Congress specified that the City of Pierre, South Dakota, could own and operate certain recreation facilities and lease land for certain purposes, providing all receipts therefrom should be used for development and maintenance of the Island; and ultimately in August of 1947, 61 Stat. 740, the Congress authorized the City of Pierre to transfer its interest in Farm Island to the South Dakota Department of Game, Fish and Parks to be "used only for such purposes as are now or may hereafter be authorized by the laws of the State of South Dakota, exclusive of said Commission's right to sell the property."

■ The State of South Dakota resisted the condemnation on the grounds of lack of authority to condemn. The District Court denied the State's motion to dismiss. United States v. 929.70 Acres of Land, et cetera, D.C.S.D., 205 F.Supp. 456. We think the District Court correctly refused to dismiss the proceedings.

■ Appellant asserts that the District Court erred in rejecting market value as the method of compensation. We address ourselves first to that issue since in our view it is of paramount importance and its resolution determinative of our disposition of this appeal.

In Kimball Laundry Co. v. United States, 338 U.S. 1, 5, 69 S.Ct. 1434, 1437, 93 L.Ed. 1765, the United States Supreme Court, speaking through Mr. Justice Frankfurter, said:

> " * * * 'Value is a word of many meanings.' Southwestern Bell Telephone Co. v. Public Service Comm., 262 U.S. 276, 310 [43 S.Ct. 544, 554, 67 L.Ed. 981]. For purposes of the compensation due under the Fifth Amendment, of course, only that 'value' need be considered which is attached to 'property,' [2] but that only

"2. U.S.Const. Amend. V: ' * * * nor shall private property be taken for public use, without just compensation.'

> approaches by one step the problem of definition. The value of property springs from subjective needs and attitudes; its value to the owner may therefore differ widely from its value to the taker. Most things, however, have a general demand which gives them a value transferable from one owner to another. As opposed to such personal and variant standards as value to the particular owner whose property has been taken, this transferable value has an external validity which makes it a fair measure of public obligation to compensate the loss incurred by an owner as a result of the taking of his property for public use. In view, however, of the liability of all property to condemnation for the com-

mon good, loss to the owner of non-transferable values deriving from his unique need for property or idiosyncratic attachment to it, like loss due to an exercise of the police power is properly treated as part of the burden of common citizenship. See Omnia Commercial Co. v. United States, 261 U.S. 502, 508–509 [43 S.Ct. 437, 438, 67 L.Ed. 773]. Because gain to the taker, on the other hand, may be wholly unrelated to the deprivation imposed upon the owner, it must also be rejected as a measure of public obligation to requite for that deprivation. McGovern v. New York, 229 U.S. 363 [33 S.Ct. 876, 57 L.Ed. 1228]; United States ex rel. T. V. A. v. Powelson, 319 U.S. 266 [63 S.Ct. 1047, 87 L.Ed. 1390].

"The value compensable under the Fifth Amendment, therefore, is only that value which is capable of transfer from owner to owner and thus of exchange for some equivalent. Its measure is the amount of that equivalent. But since a transfer brought about by eminent domain is not a voluntary exchange, this amount can be determined only by a guess, as well informed as possible, as to what the equivalent would probably have been had a voluntary exchange taken place. If exchanges of similar property have been frequent, the inference is strong that the equivalent arrived at by the haggling of the market would probably have been offered and accepted, and it is thus that the 'market price' becomes so important a standard of reference.[3] But when the property is of a kind seldom exchanged, it has no 'market price,' and then recourse must be had to other means of ascertaining value, including even value to the owner as indicative of value to other potential owners enjoying the same rights. Cf. Old South Association [in Boston] v. Boston, 212 Mass. 299, 99 N.E. 235."

In Olson v. United States, 292 U.S. 246, 254, 54 S.Ct. 704, 708, 78 L.Ed. 1236, the Supreme Court had this to say:

" * * * The judicial ascertainment of the amount that shall be paid to the owner of private property taken for public use through exertion of the sovereign power of eminent domain is always a matter of importance for, as said in Monongahela Navigation Co. v. United States, 148 U.S. 312, 324 [13 S.Ct. 622, 625, 37 L.Ed. 463]: 'In any society the fullness and sufficiency of the securities which surround the individual in the use and enjoyment of his property constitute one of the most certain tests of the character and value of the government.' The statement in that opinion (page 326 of 148 U.S. [13 S.Ct. p. 622, 626, 37 L.Ed. 463]) that 'no private property shall be appropriated to public uses unless a full and exact equivalent for it be returned to the owner' aptly expresses the scope of the constitutional safeguard against the uncompensated taking or use of private property for public purposes. Reagan v. Farmers' Loan & Trust

---

"3. Once taken, of course, property can have no actual market value except as giving rise to a claim against the taker. See 1 Bonbright, The Valuation of Property 414 (1937). In view of the resulting necessity of postulating a hypothetical sale, care must be taken to avoid the extremes, on the one hand, of excluding the value of the property for special uses and, on the other, of supposing the hypothetical purchaser to have either the same idiosyncrasies as the owner (compare L. R. Junction Ry. v. Woodruff, 49 Ark. 381, 5 S.W. 792, with Producers' Wood Preserving Co. v. Commissioners of Sewerage, 227 Ky. 159, 12 S.W.2d 292) or the same opportunities for use of the property as a taker armed with the power of eminent domain (see e. g., United States v. Chandler-Dunbar Co., 229 U.S. 53 [33 S.Ct. 667, 57 L.Ed. 1063]; McGovern v. New York, 229 U.S. 363 [33 S.Ct. 876, 57 L.Ed. 1228]; Olson v. United States, 292 U.S. 246 [54 S.Ct. 704, 78 L.Ed. 1236]; United States ex rel. T. V. A. v. Powelson, 319 U.S. 266 [63 S. Ct. 1047, 87 L.Ed. 1390]).

Co., 154 U.S. 362, 399 [14 S.Ct. 1047, 38 L.Ed. 1014].

"That equivalent is the market value of the property at the time of the taking contemporaneously paid in money. Seaboard Air Line Ry. v. United States, 261 U.S. 299, 306 [43 S.Ct. 354, 67 L.Ed. 664]. Jacobs v. United States, 290 U.S. 13, 17 [54 S.Ct. 26, 78 L.Ed. 142]. 2 Lewis, Eminent Domain (3d Ed.) § 682, p. 1172. It may be more or less than the owner's investment. He may have acquired the property for less than its worth or he may have paid a speculative and exorbitant price. Its value may have changed substantially while held by him. The return yielded may have been greater or less than interest, taxes, and other carrying charges. The public may not by any means confiscate the benefits, or be required to bear the burden, of the owner's bargain. Vogelstein & Co. v. United States, 262 U.S. 337, 340 [43 S.Ct. 564, 67 L.Ed. 1012]. He is entitled to be put in as good a position pecuniarily as if his property had not been taken. He must be made whole but is not entitled to more. It is the property and not the cost of it that is safeguarded by state and Federal Constitutions. The Minnesota Rate Cases [Simpson v. Shepard], 230 U.S. 352, 454 [33 S.Ct. 729, 57 L.Ed. 1511],

*"Just compensation includes all elements of value that inhere in the property, but it does not exceed market value fairly determined. The sum required to be paid the owner does not depend upon the uses to which he has devoted his land but is to be arrived at upon just consideration of all the uses for which it is suitable. The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered, not necessarily as the measure of value, but to the full extent that the pros-*

*pect of demand for such use affects the market value while the property is privately held.* Mississippi & R. R. Boom Co. v. Patterson, 98 U.S. 403, 408 [25 L.Ed. 206]. Clark's Ferry Bridge Co. v. Public Service Commission, 291 U.S. 227 [54 S.Ct. 427, 78 L.Ed. 767]. 2 Lewis, Eminent Domain (3d Ed.) § 707, p. 1233; 1 Nichols, Eminent Domain (2d Ed.) § 220, p. 671." (Emphasis supplied.)

We do not believe, after a careful review of the record, that there was need or justification for a departure from the concept of market value as the standard of just compensation in Federal eminent domain cases and conclude that its submission on a substitute site theory was prejudicial error which requires us to reverse.

This appeal contains elements somewhat novel in nature. In its Memorandum Decision filed September 19, 1962, following a pre-trial conference two days earlier, the District Court held, without the taking of testimony, that "In this case a need exists to replace the property and facilities taken."

At the conclusion of the case, the Court, apparently *sua sponte*, submitted to the jury a special interrogatory which read:

"Do you find that there is an obligation and need for the State of South Dakota, Department of Game, Fish and Parks, to establish a substitute state park for Farm Island State Park in this locality?"

"To which the jury replied, 'Yes.'"

■ We think this interrogatory, couched as it was, contained a mixed question of law and fact. Whether South Dakota was "obligated" to establish a substitute state park for Farm Island State Park was a question of law for the Court and not a question of fact for the jury. The question of "need" would, of course, be a factual question for jury determination if the interrogatory were either necessary or proper. Since we conclude that the case should

have been submitted to the jury on the fair market value concept, it was error to have submitted the interrogatory. Moreover, to the extent that the subject matter was appropriate for jury consideration, we think it could have been included in the general instructions to the jury.

We do not wish to be understood as denying to the trial Court such liberality and flexibility in the reception of evidence as the circumstances may require so long as market value is not abandoned as the ultimate test in this case. See Clark v. United States, 8th Cir., 155 F.2d 157; United States v. Devore, 8th Cir., 133 F.2d 694; United States v. City of Jacksonville, 8th Cir., 257 F.2d 330, 334.

Other questions have been raised and considered by us upon this appeal. We think it unnecessary to discuss them individually since it is unlikely they will arise on a retrial of this case in view of the conclusions we reach on the instant appeal.

The judgment of the District Court is reversed and the case remanded for a new trial.