**CLARK et al. v. UNITED STATES.**

No. 13212.

Circuit Court of Appeals, Eighth Circuit.

May 6, 1946.

Roy K. Dietrich, of Kansas City, Mo. (Harvey Burrus, of Independence, Mo., and Gossett, Ellis, Dietrich & Tyler, of Kansas City, Mo., on the brief), for appellants.

George S. Swarth, Atty., Department of Justice, of Washington, D. C. (J. Edward Williams, Acting Head, Lands Division, Department of Justice, of Washington, D. C., Morgan M. Moulder, Sp. Asst. to U. S. Atty., of Kansas City, Mo., and Roger P. Marquis, Atty., Department of Justice, of Washingthon, D. C., on the brief), for appellee.

Before GARDNER, JOHNSEN and RIDDICK, Circuit Judges.

GARDNER, Circuit Judge.

This is an appeal by landowners from a judgment entered in a condemnation proceeding instituted by the United States under the Military Purposes Act of July 2, 1917, c. 35, 40 Stat. 241, as amended, 50 U.S.C.A. § 171.

So far as here material the proceedings involved the taking of a tract of 320 acres of land in Jackson County, Missouri, in fee simple for the expansion of the Lake

City Ordnance Plant and for related military purposes. Appellants, Charles E. Clark and his wife, Hencey M. Clark, were the owners of 500 acres of land of which the government has taken the west 320 acres, leaving a strip of 180 acres unappropriated. Appellant Charles E. Clark is an engineering contractor and president and principal owner of a construction company having some 600 or 700 employees. He desired to develop a tract of land as a stock farm and as a recreation center where cabins, fishing, camping and other similar facilities would be available to the employees of his company and others. With this purpose in mind, in 1937 he acquired a 500 acre tract of land located approximately 20 miles east of Kansas City, Missouri. County roads ran east and west along the north and south boundaries and a highway to the east was easily accessible. Long Branch Creek extended the full north and south length of the east 180 acres, which were not condemned. In the southwest corner of the tract there were about 60 acres of woods consisting of white oak timber. He employed a construction company to remove the brush and do clearing, and a herd of 500 goats was used to clear underbrush. When the property was purchased the improvements were practically worthless, so that when the property was condemned substantially all the improvements had been erected by appellants except the house which they substantially rebuilt.

Within the 320 acres, and in the fork of Long Branch Creek, a dam was constructed which created a lake with an area of about 15 acres. A peninsula was built into the lake four feet above the water, 300 or 400 feet wide, with a road traversing its length so that cars could be driven onto the peninsula. On the south side a shallow beach was built where those inexperienced in swimming could wade out a distance of 60 to 80 feet. The lake was bordered by a tract of tree land left as sites suitable for cabins and outdoor ovens. The entire 500 acre tract was fenced with woven wire from 24 to 50 inches in height, with a barbed wire at the bottom and two or three barbed wires at the top. The tract was cross fenced to divide it into appropriate fields and pastures. A strata of gravel was located in the southeast corner of the tract which contained what is referred to as an unlimited supply of water, and a well was constructed which had a capacity of 2500 gallons per hour. The well was enclosed by a pump house equipped with an electric pump. From the well and pump house a three inch water main was laid to a 30,000 gallon water tower erected in the western part of the tract at approximately the highest point on the land from which water flowed by gravity through pipe lines to all parts of the 500 acre tract. The pipe lines were laid to stock tanks in the various fields, the main pipe line going through the dam to the place where the cabins were to be erected. An electric power line was brought to the premises by the construction of 800 lineal feet of power line. 1700 lineal feet of rock road were constructed on the farm. Three ponds were developed and enlarged and nine new ponds were constructed, all stocked with fish. Two concrete silos, a scale and scale house, loading chute, large cattle shed, stock yards, a wash house, two garages, a corn crib, storm shed, bunk house, a chicken and brooder house, two chicken ranges, a large shop building, a cow shed, a cabin on the picnic grounds, a sheep shed, a sheep herder's house, and numerous small buildings were constructed by appellants and were on the premises when condemned.

Severing the west 320 acres left the 180 acre strip of land on the east one mile in length and a quarter of a mile in width, with a 20 acre tract to the east of the northeast corner, making up the 180 acres. The well, pump house and water facilities had been constructed on the south end of the 180 acre tract and were not necessary when the west 320 acres were taken as there was ample water in the Long Branch Creek for all the cattle that could be maintained on this 180 acre tract.

Appellants sought to prove that the reasonable depreciated value of the various improvements on the tract at the time of the taking was $46,366. The court sustained objections to the testimony and to an offer of proof. There was an offer to prove the value of the tract of white oak in the southwest corner of the property

taken, but this also was rejected. There was no evidence of sales of similar property in the vicinity of the tract condemned but values were sought to be established by opinions of expert witnesses as to the market value of the property. Six witnesses testifying for appellants each placed a value on the premises or an estimate as to the amount of damages, these opinions or estimates ranging from $60,000 to $110,000. Three witnesses called by the government each fixed the value of the property or extent of the damages, the opinions ranging from $25,000 to $28,500.

The petition in condemnation was filed June 11, 1942, and an order of immediate possession was signed and filed on the same date. The real estate project manager for the government notified Mr. Clark that the government had to have actual physical possession of the 320 acre tract by midnight of July 11, 1942. Clark desired apparently to remove certain improvements and was proffered a written instrument for his signature, purporting to be an "Agreement for Removal of Property." The instrument in form agreed that Clark might remove certain designated improvements at an agreed value of $1,800. It was signed by Mr. Clark but was not signed by any one on behalf of the United States. Clark then went to the Commandant at Lake City with reference to his purported agreement and was advised that there would be ample time for him to remove the improvements. The improvements mentioned in the instrument were removed by Clark. A witness for the government over objection of defendants was permitted to testify that the improvements removed were worth $3,000. The court in its instructions permitted the jury to find the value of the improvements removed, less the costs of removal, and deduct that amount from the award and did not limit the value to $1,800. The jury returned a verdict of $31,200, and from the judgment entered thereon this appeal is prosecuted.

In seeking reversal appellants contend that: (1) the trial court erred in refusing to permit evidence to be offered as to the separate value of the improvements; (2) the trial court erred in refusing to permit a separate valuation of the white oak timber lands; (3) the court erred in not rec-ognizing the contract for removal of the improvements as binding; (4) the verdict is inadequate in amount.

Under the Fifth Amendment to the Constitution private property may not be taken for public use without just compensation. What is meant by just conpensation has been defined by the Supreme Court as, "the full and perfect equivalent in money of the property taken." United States v. Miller, 317 U. S. 369, 63 S.Ct. 276, 279, 87 L.Ed. 336, 147 A.L.R. 55. Appellants owned the structures which they had placed on this land as much as they owned the land, and these structures had an intrinsic value. They were reasonably adapted to the purposes for which the land was being used and they added to the value of the land, and they should be considered in determining just compensation to the extent that they enhanced the value of the land. As said by us in United States v. Becktold Co., 8 Cir., 129 F.2d 473, 476, the government "* * * is liable for the value of the land as enhanced, if at all, by any permanent structure that is upon it. * * * The question is not what value the property may have to the Government, but what damage defendant suffers by the taking of the property."

Here it appears that there had been no recent sales of similar property in the vicinity of this land and it can not be said that the property in a technical sense had a market value. In such circumstances the opinion of expert witnesses unsupported by other facts and circumstances is of little value, and resort should be had to such other available evidence as may throw light upon the question of value. As said by the Supreme Court in United States v. Miller, supra, "Where, for any reason, property has no market value, resort must be had to other data to ascertain its value; and, even in the ordinary case, assessment of market value involves the use of assumptions, which make it unlikely that the appraisal will reflect true value with nicety. It is usually said that market value is what a willing buyer would pay in cash to a willing seller. Where the property taken, and that in its vicinity, has not in fact been sold within recent times, or in significant amounts, the application of this con-

cept involves, at best, a guess by informed persons."

It is true that much is left to the discretion of the trial court in admitting evidence as to the value of the property taken in condemnation proceedings. Ramming Real Estate Co. v. United States, 8 Cir., 122 F.2d 892; Union Electric Light & Power Co. v. Snyder Estate, 8 Cir., 65 F.2d 297. The discretion, however, is not an arbitrary one, but must be exercised judicially, and where, as here, there can not be said to be a market value the inquiry may properly cover a wide scope. In discussing the question of evidence as to value in Hard & Rand, Inc. v. Biston Coffee Co., 8 Cir., 41 F.2d 625, 627, we said: "Evidence of the cost, selling price, replacement value, depreciation, use value, junk value, location of the property, local demand for it, and many other things may be shown."

The property was highly developed and improved both for stock farming and for recreation purposes and the improvements were well adapted to such purposes. The property is located near a metropolitan center and the development of recreation facilities in that area would seem to have substantial basis as a business venture. In such circumstances evidence as to the intrinsic value of the improvements should, we think, have been admitted as an aid to the jury in arriving at a decision of the ultimate question of just compensation for the property taken. United States v. Becktold Co., supra; Union Electric Light & Power Co. v. Snyder Estate, supra; United States v. Devore, 8 Cir., 133 F.2d 694; United States v. Savannah Shipyards, 5 Cir., 139 F.2d 953; United States v. 2.4 Acres of Land, etc., 7 Cir., 138 F.2d 295; Standard Oil Co. v. Southern Pacific Co., 268 U.S. 146, 45 S.Ct. 465, 69 L.Ed. 890; City of St. Louis v. Turner, 331 Mo. 834, 55 S.W.2d 942; City of St. Louis v. Paramount Shoe Mfg. Co., 237 Mo.App. 200, 168 S.W.2d 149.

In the instant case the value of the property is to a very large extent in the structures and other improvements which will be taken or destroyed as part of the realty. As said by Judge Northcott, speaking for the Fourth Circuit, in United States v. Wise, 131 F.2d 851, 852, where it was argued that the trial court erred in admitting evidence as to the reproduction cost of structural improvements on the property, and in admitting evidence relative to the original cost of building a road, a telephone line and a power line to the property:

"An examination of the cases shows some conflict but there is no doubt that the overwhelming weight of authority is to the effect that the admissibility of evidence of this character is largely governed by the peculiar circumstances of each case and rests to a great extent in the discretion of the trial judge.

\* \* \* \* \* \*

"A study of the record leads us to the conclusion that this evidence was properly admitted under the instruction of the trial judge and that there was no abuse of discretion by the judge in admitting it."

In such circumstances to refuse to permit the jury to be informed as to the value of the structures is an abuse of discretion. It is worthy of note that the structures and improvements were not only numerous but varied in character and some of them at least were unusual in character. For example, to inform the ordinary juror of the construction of a dam creating a lake with an area of 15 acres and the building of a peninsula into the lake 4 feet above the water some 300 or 400 feet wide, would give him but little information as to the value of the property as improved by the construction of this lake. Other improvements were equally unusual and more or less technical in character, to be understood by a trained civil engineer rather than by the layman making up the jury. Indeed, it appears that the expert witnesses who testified on behalf of the government could place no value on separate improvements except the house. The first of these witnesses had had wide experience in appraising farms. The rest also had experience in the appraisal of farm lands. They appraised the land as a stock farm but could place no value on the improvements except the value of the house and other buildings. The second of these witnesses referred to the other improvements as "excessive improvements." The third government witness fixed the value by capitalizing

the net income. On cross-examination he testified as to the value of some of the improvements but not as to all of them. While defendants were permitted to show the nature and extent of the improvements, they were not permitted to show the intrinsic depreciated value of the improvements except through cross-examination of witnesses for the government, which, of course, put them to a decided disadvantage, and the rejection of their proffered testimony was, we think, prejudicial.

▪▪▪ As has been observed there was certain timber land on the property taken and defendants offered to prove the value of the tract of white oak. This evidence was rejected. Defendants offered to prove that 55 acres of this white oak timber land was worth $200 an acre. The witness who was properly qualified placed a higher value on the timber land than the land without timber. In United States v. Devore, supra, the trial court admitted evidence as to the separate value of timber upon land taken in condemnation proceedings. In sustaining the admissibility of the testimony, we said [133 F.2d 695]: "The timber upon the land sought to be taken was of substantial value in money, of which the owners would be deprived unless the indemnity should be measured in a proper way depending upon the circumstances of the case."

We think it was prejudicial not to permit defendants' witness to tell the jury what part of the value he placed on the timber land and what part on the rest of the land. In eminent domain proceedings the rule is that all facts which an ordinarily prudent man would take into account before forming a judgment as to the market value of property he contemplates purchasing is relevant and material. The landowner should be allowed to state and to have his witnesses testify to every fact concerning the property which he would normally or ordinarily be disposed to put forth in order to place it in an advantageous light if he were attempting to negotiate a sale of it to a private individual. He was entitled to present to the jury all the elements reasonably affecting the value of the property for all uses for which it was suitable. St. Louis, I. M. & S. R. Co. v. Theodore Max-field Co., 94 Ark. 135, 126 S.W. 83, 26 L.R.A.,N.S. 1111.

In National Brick Co. v. United States, 76 U.S.App.D.C. 329, 131 F.2d 30, 31, the trial court rejected testimony as to the value of sand contained on the land taken. In reversing the case the court, among other things, said:

"Obviously, the Court was originally of opinion that the presence on the property of the sand bank forty to ninety feet high, containing 300,000 cubic yards of pure sand was of no consequence in determining the value of the property taken, and that the added value by reason of the presence of the sand should not be considered. On this theory most of the evidence of the additional value of the sand in the bank as it was and of the additional value of the property by reason of presence of the sand was rejected.

"This opinion of the Court was, of course, wrong, for no rule is better established than that the special value of land due to its adaptability for use in a particular business is an element which the owner of land is entitled to have considered in determining the amount to be paid in just compensation.

"* * * And we know of no other evidence by which the jury could be properly guided in determining the value of the property than to be told the per ton value of the sand as it lay, or, without this knowledge, how the jury could ever have reached a judgment based on anything more than guess or speculation."

We think the rejection of this proffered evidence was prejudicial error.

▪▪▪ Appellant Charles E. Clark testified that after the condemnation proceedings had been initiated he negotiated with the War Department real estate project manager relative to removing from the 320 acres condemned certain improvements and for an allowance of $1,800 for the improvements removed. He also testified that he signed an agreement to that effect as tendered by the project manager, and that later, in conversation with the Commandant in charge, the agreement was confirmed, and that he accordingly removed the improvements. As has been observed,

the court permitted the government to prove the value of the improvements so removed and did not confine the value to $1,800. The court also rejected the written document which was offered by the appellants. The document was signed by Mr. Clark but was not signed by his wife, nor was it signed by any one on behalf of the United States. As a written contract it was not binding until signed by the parties intended to be held by its terms. A potential contract could not be executed by the Commandant in charge of the project. The Act of October 21, 1942, c. 618, 56 Stat. 797, 40 U.S.C.A. § 258f, is as follows: "In any condemnation proceedings instituted by or on behalf of the United States, the Attorney General is authorized to stipulate or agree in behalf of the United States to exclude any property or any part thereof, or any interest therein, that may have been, or may be, taken by or on behalf of the United States by declaration of taking or otherwise."

Section 5, Executive Order No. 6166, June 10, 1933, 5 U.S.C.A. §§ 124–132 note, which was authorized by appropriate legislation reads in part as follows: "As to any case referred to the Department of Justice for prosecution or defense in the courts, the function of decision whether and in what manner to prosecute, or to defend, or to compromise, or to appeal, or to abandon prosecution or defense, now exercised by any agency or officer, is transferred to the Department of Justice."

Neither the War Department real estate project manager nor the Commandant in charge of the project had authority to bind the United States either by written contract or by oral agreement. The United States could be bound only by agents acting within the scope of the authority delegated to them. Rosenberg v. United States, 9 Cir., 31 F.2d 838; American Sales Corp. v. United States, 5 Cir., 32 F.2d 141. In view of the condition of the record it was not error to sustain the government's objections to this proffered testimony, nor was it error to instruct the jury that it should deduct from the award such amount as it found to be the reasonable value of the improvements removed.

As to this phase of the case, we observe that on their motion for new trial appellants contended and offered to prove that the sale of the improvements was a completed transaction. Confessedly, appellants had had negotiations with certain representatives of the government looking to a sale of these improvements for $1,800. These representatives, we have held, did not have the authority to bind the government by a written contract of sale. On their motion for a new trial appellants offered to prove that the government had appraised the property taken at $25,000; that after such appraisal the negotiations for sale of certain improvements to appellants for $1,800 took place, and thereafter, and while the condemnation proceedings were pending, it filed a declaration of taking, and deposited only $23,200, exactly $1,800 less than its own appraisal. This was presumably done with authority and in apparent recognition or confirmation of the negotiations for sale, thus consummating the sale by the government paying itself $1,800 out of the money confessedly due appellants. It is admitted, and the evidence conclusively shows, that appellants in good faith and in reliance upon their negotiations for purchase of these improvements at $1,800, removed them from the property under condemnation. If on retrial the evidence shows the foregoing alleged facts, then the government should be precluded from asking to have the jury determine the value of the improvements.

While we do not ordinarily review the action of the trial court on denying motion for new trial, yet it seems proper that the trial court should have our views on this question, as it is bound to arise on retrial.

We find it unnecessary to pass upon the other contentions of appellants. The judgment appealed from is reversed and the cause remanded with directions to grant appellants a new trial.