**STATE of Indiana, Appellant–Plaintiff,**

**v.**

**Stephen BISHOP, Molly Bishop, Dale Gladden, and Hendricks County, Indiana, Appellees–Defendants.**

No. 32A01–0106–CV–238.

Court of Appeals of Indiana.

Sept. 16, 2002.

Rehearing Denied Oct. 24, 2002.

Steve Carter, Attorney General of Indiana, Janet L. Parsanko, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellant.

Marvin Mitchell, Mitchell Hurst Jacobs & Dick, Indianapolis, IN, Attorney for Appellees.

## OPINION

SULLIVAN, Judge.

Appellant, the State of Indiana, commenced an eminent domain proceeding against land owned by Stephen and Molly

Bishop.[1] Following a jury trial upon the issue of the compensation owed the Bishops, the trial court ordered the State to pay the Bishops $508,185.78. Upon appeal, the State presents three issues which we restate as follows:

I. Whether the trial court improperly denied the State's motion to withdraw its timely-filed exceptions to the appraisers' report;

II. Whether the trial court erred in allowing the Bishops to present evidence of the capitalization of income method of valuation; and

III. Whether the trial court erred in excluding evidence regarding the cost to relocate three billboard signs onto the residue of the Bishops' property.

We affirm.

A brief summary of eminent domain procedures will help to explain the facts relevant to this case. Indiana Code Sections 32–11–1–1 through 32–11–1–13 govern the procedures for the exercise of eminent domain.[2] *Daugherty v. State*, 699 N.E.2d 780, 782 (Ind.Ct.App.1998), *trans. denied*. The process set forth in these statutes has been explained as follows:

"*First*, when the complaint is filed a notice is issued and served on the landowner requesting his appearance at a stated time to show cause, if any he have, why the land should not be appropriated. If he believes he has cause he may file 'objections'. If no objections are filed, or if those filed are overruled, an order of appropriation is entered and three appraisers are appointed and ordered to file their report appraising the

damage to the landowner resulting from the appropriation.

*Second*, within [twenty] days of the date the report of appraisal is filed, either or both parties may file 'exceptions' to the appraisal.

If timely filed, exceptions raise the issue of the amount of the landowner's damages. That issue is tried *de novo* by the judge, or by a jury if timely requested. If no exceptions are timely filed the appraisers' award becomes final."

*Lehnen v. State*, 693 N.E.2d 580, 581–82 (Ind.Ct.App.1998) (alteration in original) (footnote omitted) (*quoting Cordill v. City of Indianapolis*, 168 Ind.App. 685, 687, 345 N.E.2d 274, 275 (1976)), *trans. denied; accord Daugherty*, 699 N.E.2d at 781–82.

In the case at bar, the record reveals that on December 6, 1996, the State commenced this eminent domain action to appropriate certain property in Hendricks County for the construction of a cloverleaf interchange at the intersection of Interstate 70 and State Road 267. The State had previously offered the Bishops $99,400 to purchase the land. *See* Ind.Code § 32–11–1–1(b) (Burns Code Ed. Repl.1995).[3] The land at issue is located along I 70 east of Road 267 and is divided by I–70 into northern and southern parcels. Pursuant to the trial court's order of appropriation, entered on October 15, 1997, the State took .681 acres of the northern parcel and .496 acres of the southern parcel, for a total appropriation of 1.177 acres. The residue of the Bishops' land constituted 73.144 acres. Located on the appropriated land were four billboard structures ("billboards") owned by the Bishops.

The court-appointed appraisers entered their report on November 14, 1997, and

1. Dale Gladden and Hendricks County were also named as defendants in the State's complaint for appropriation. They are not active parties to this appeal.

2. Effective July 1, 2002, Article 11 of Title 32 is codified at Article 24 of Title 32.

3. Now Ind.Code § 32–24–1–3(b)(2) (Burns. Code Ed. Repl.2002).

assessed the value of the land and improvements thereon to be $191,510. On December 9, 1997, the State filed exceptions to the appraisers' report, claiming the appraisers overvalued the land and improvements. *See* Ind.Code § 32–11–1–8 (Burns Code Ed. Repl.1995).[4]

On March 27, 2000, the State filed a motion to withdraw its previously-filed exceptions and for judgment. The following day, the Bishops filed a response in opposition to the State's motion to withdraw the exceptions.[5] On March 31, the State, pursuant to Indiana Code § 32–11–1–8.1 (Burns Code Ed. Repl.1995),[6] offered to settle the Bishops' claims for a sum of $267,300. On May 4, 2000, the trial court denied the State's motion to withdraw its exceptions and for judgment.

On March 26, 2001, trial began on the issue of the damages owed to the Bishops. At the conclusion of the trial on March 28, 2001, the jury returned a verdict of $595,000. From this the court deducted $191,510, representing the appraisers' award which had earlier been deposited by the State and withdrawn by the Bishops,[7] and added $102,195.78 in interest[8] and $2,500 in litigation expenses,[9] for a total of $508,185.78. The State filed a motion to correct error on April 27, 2001, which the trial court denied on May 1, 2001.

I

*Withdrawal of Exceptions*

■ The State claims the trial court erred when it denied the State's motion to withdraw its exceptions to the report of the court-appointed appraisers. Here, although the State timely filed exceptions to the appraisers' report on December 9, 1997, the Bishops never filed exceptions. Thus, the State claims that, as the only party which filed exceptions, it should have been allowed to withdraw the same, thereby eliminating the need for a trial.

The relevant case law on this subject reveals two lines of cases, one of which suggests an absolute right of a party to withdraw exceptions to an appraisers' report. In *State v. Redmon*, 205 Ind. 335, 340, 186 N.E. 328, 329 (1933), the Court held that, if a party who has filed timely exceptions to an appraisers' report dismisses the exceptions, there is no issue as to damages before the court. In *Denny v. State*, 244 Ind. 5, 12, 189 N.E.2d 820, 823 (1963), the Court, citing *Redmon*, stated, "When, as in this case, appellant has withdrawn the amount of the appraisers' award, and the State has withdrawn its exceptions to the award, no issue remained before the trial court which could be submitted to the jury for determination." These cases would appear to support the State's position. However, in *Redmon*, the Court noted that the trial court had sustained the State's motion to dismiss its exceptions, implying that the trial court had some authority to permit or deny the State's motion to dismiss.

The other line of cases, starting with *State v. Blount*, 154 Ind.App. 580, 290

---

4. Now Ind.Code § 32–24–1–11 (Burns Code Ed. Repl.2002).

5. Also on March 28, 2000, Robert Wagner, a mediator, filed a report with the trial court indicating that an attempted mediation had been unsuccessful.

6. Now Ind.Code § 32–24–1–12 (Burns Code Ed. Repl.2002).

7. *See* Ind.Code §§ 32–11–1–7, 32–11–1–8 (Burns Code Ed. Repl.1995), now Ind.Code §§ 32–24–1–10, 32–24–1–11 (Burns Code Ed. Repl.2002).

8. *See* I.C. § 32–11–1–8.

9. *See* Ind.Code § 32–11–1–10 (Burns Code Ed. Repl.1995), now Ind.Code § 32–24–1–14 (Burns Code Ed. Repl.2002).

N.E.2d 480 (1972), rejects the notion that parties have an absolute right to withdraw previously filed exceptions to an appraisers' report. In *Blount,* the court-appointed appraisers' report, fixing damages at $5,499.90, was filed on September 15, 1969. Two days later, the State timely filed exceptions to the appraisers' report, but the landowner-defendant filed no exceptions. On December 18, 1969, both parties attended a pre-trial conference, after which the trial court entered a pre-trial order pursuant to Indiana Trial Rule 16. This pre-trial order enumerated the issues for trial, stated that the issues were closed, set the trial date, and stated, "this order will control the course of the trial and may not be amended except by consent of the parties and the Court, or by order of the Court to prevent manifest injustice." *Blount,* 154 Ind.App. at 582, 290 N.E.2d at 482. The trial court postponed the original trial date. Nevertheless, on the re-scheduled trial date of May 17, 1971, the State appeared, but declined to either proceed to trial or request a continuance. On July 22, 1971, nineteen months after the entry of the pre-trial order, twenty-two months after the filing of the appraisers' report, and over two months after the scheduled trial date, the State moved to withdraw its exceptions. The trial court overruled the motion and the cause eventually went to trial, resulting in an award of $9,000 for the defendant-landowner.

Upon appeal, the State, as it had at trial, relied upon *Redmon* and *Denny* to support its argument that it had an absolute right to withdraw its exceptions. The first district of this court disagreed, and held that "The State having sought a jury trial, and having agreed thereto via the pre-trial order, cannot be heard many months later, to complain of being held to that which it sought and to which it agreed to be bound." *Blount,* 154 Ind.App. at 583–84,

290 N.E.2d at 483. The *Blount* court further held that the filing of exceptions by either party is sufficient to submit the question of damages to the trier of fact, and that it is unnecessary for a landowner to file exceptions as a condition precedent to his right of recovery, if exceptions have been filed by the condemning party. 154 Ind.App. at 585, 290 N.E.2d at 484. Thus, the *Blount* decision would appear to have placed a substantial limit upon a party's ability to withdraw previously filed exceptions to an appraisers' report.

This court was faced with a similar situation in *McGill v. Muddy Fork of Silver Creek Watershed Conservancy Dist.,* 175 Ind.App. 48, 370 N.E.2d 365 (1977), *questioned on other grounds by Martin v. State,* 774 N.E.2d 43 (Ind., 2002), wherein the court-appointed appraisers' report was filed on January 10, 1972, and the District filed exceptions thereto the same day. The District had previously filed a motion for a jury trial on December 20, 1971. The McGills filed exceptions on January 21, 1972, which were untimely under the version of I.C. § 32–11–1–8 then in effect. *See McGill,* 175 Ind.App. at 54, 370 N.E.2d at 369. Upon the McGills' request, trial was set for June 26, 1975. Six days before trial, however, the District moved to withdraw its exceptions, strike the McGills' exceptions as untimely, and for summary judgment. The trial court granted the District's motion to withdraw, and the McGills appealed, relying upon *Blount* for the proposition that the District's motion to withdraw was untimely.

The *McGill* court disagreed, distinguishing the case from *Blount* upon the grounds that the parties before them, unlike the parties in *Blount,* "did not participate in a pre-trial conference or agreement, or receive a pre-trial order." 175 Ind.App. at

51, 370 N.E.2d at 368.[10] The *McGill* court clarified the holding in *Blount* by stating:

> "This court did not hold in *Blount* that there is some time span after which a motion to withdraw in a condemnation case becomes untimely; or that solely by filing a request for a jury trial some 'implied agreement' arises between the parties which precludes any later withdrawal of the exceptions.
>
> We do not find *Blount* compelling in this case. In the absence of such an express agreement or pre-trial order we hold that the District's motion to withdraw its exceptions was timely filed and the trial court did not err in granting said motion." 175 Ind.App. at 51–52, 370 N.E.2d at 368.

Following the *Blount* and *McGill* decisions, other decisions noted that a party who files timely exceptions to the appraisers' report does not have an absolute right to later withdraw those exceptions. *See State v. Berger*, 534 N.E.2d 268, 269–70 (Ind.Ct.App.1989) (noting exceptions to the rule that, by dismissing his own exceptions, a party may preclude others from litigating damages), *trans. denied; Public Service Co. of Indiana, Inc. v. Rounder*, 423 N.E.2d 666, 667 (Ind.Ct.App.1981) (citing *Blount* in stating that absent an express pre-trial agreement, a pre-trial order or other controlling order, a party may withdraw its exceptions to an appraisers' award when the opposing party has not filed exceptions "timely or otherwise"), *trans. denied.*

More recently, in *Daugherty, supra*, this court was again faced with a similar situation. In *Daugherty*, the State timely filed exceptions to the appraisers' report, but later wished to withdraw the exceptions over the objection of the landowner, who had not filed exceptions. The trial court allowed the State to withdraw its exceptions. Upon appeal, Daugherty claimed the trial court erred in permitting the State to unilaterally withdraw the exceptions. After analyzing the *Blount, McGill,* and *Berger* decisions, the *Daugherty* court held as follows:

> "The effect of the *Blount* decision and the subsequent cases that recognized this exception was to create a rule that was regulated through the trial court's discretion. Our decision here makes explicit what was implied in *Blount*: *a party does not have an absolute right to withdraw exceptions to the appraisers' report;* rather, the withdrawal of exceptions is subject to the trial court's discretion. While the court in the exercise of such discretion may ordinarily allow the withdrawal, it may deny the request to withdraw or condition the withdrawal upon such terms and conditions as the court deems necessary to avoid injustice.
>
> The trial court in exercising its discretion should allow the withdrawal of exceptions except in instances where injustice would result. In making such a determination, the trial court should consider the following nonexclusive factors: the length of time between the filing of the appraisers' report and the motion to withdraw, whether the withdrawing party is attempting to do so on the eve of the trial, whether the withdrawing party and trial court have been put on notice of the other party's dissatisfaction with the report, either that be through the filing of belated exceptions or otherwise, and the extent of trial preparation which has already occurred, including the securing of expert witnesses and the extent of discovery." 699 N.E.2d at 782–83.

---

10. The same panel which decided *Blount* also decided *McGill*.

■ In the case at bar, the State requests that we reconsider our decision in *Daugherty*. Rather than allowing a trial court the discretion to deny a party's request to withdraw its timely-filed exceptions, the State would have us hold that the trial court may only allow withdrawal or condition the withdrawal upon such terms and conditions as the court deems necessary to avoid injustice. However, we see no reason to stray from the logic of the *Daugherty* decision and deny the trial court the discretion to disallow a party's request to withdraw its exceptions. We do emphasize what the *Daugherty* court held: that the trial court, in exercising its discretion, *should* allow the withdrawal of exceptions except in cases where injustice would result. As did the *Daugherty* court, we also emphasize that any party desiring to insure a trial on the question of damages should file his own timely exceptions. Likewise, parties who file exceptions should understand that, under certain circumstances they might not be permitted to withdraw the exceptions and terminate the litigation which they have commenced. *See Daugherty* 699 N.E.2d at 783.

■ The State argues, that even if the trial court possessed the authority to disallow the State to withdraw its exceptions, the trial court abused its discretion in doing so. While we agree with the State that many of the arguments presented by the Bishops in opposition to the State's motion to withdraw do not establish any injustice with respect to the withdrawal of the exceptions, considering the factors set forth in *Daugherty*, we conclude that the trial court did not abuse its discretion in denying the State's motion to withdraw.

Here, the appraisers' report was filed on November 14, 1997, and the State moved to withdraw its exceptions on March 27, 2000. Thus, the State waited over two years and four months before they sought to withdraw their exceptions. Also, the State filed their motion to withdraw exceptions only fifteen days before the scheduled trial date of April 11, 2000. Although the Bishops never filed exceptions, timely or untimely, the State does not claim that it was unaware of the Bishops' dissatisfaction with the appraisers' report.[11] The last factor mentioned in *Daugherty* is the extent of trial preparation which has already occurred, including the securing of expert witnesses and the extent of discovery. Here, in support of their opposition to the State's motion to withdraw, the Bishops' counsel filed an affidavit detailing the discovery in which the Bishops had engaged. This discovery included the submission of interrogatories by the Bishops and preparation of witness and exhibit lists. The affidavit also stated that the Bishops had retained two expert witnesses,[12] and that their counsel had interviewed these experts and other witnesses and undertaken extensive research. Mr. Bishop also filed an affidavit stating that he and his wife had retained two expert witnesses and "spent several tens of thousands of dollars on attorneys' fees, appraisers and other expenditures."[13] Appendix at 189. Given

---

11. Certainly, the unsuccessful mediation which took place on March 24, 2000, revealed the Bishops' dissatisfaction with the appraisers' report.

12. The State claims that one of the Bishops' expert witnesses was hired before the State filed their complaint, and therefore the Bishops would have incurred this expense even if the State had not filed any exceptions. However, the Bishops also hired an additional expert witness, and the State's argument that this expert may not have conducted his appraisal until after the State moved to withdraw its exceptions is simply speculation.

13. Although the State maintains that such "unsupported claims" cannot be enough to support the trial court's denial of their motion to withdraw the exceptions, the trial court

the facts and circumstances before the trial court, we cannot say that the trial court abused its discretion when it denied the State's motion to withdraw its exceptions.

## II

### Capitalization of Income

■ The State claims that the trial court erred when it allowed the Bishops to present evidence concerning the "capitalization of income" approach to assess the value of the Bishops' billboards.[14] According to the State, this was improper because the Bishops had not demonstrated any interest in using the billboards in question for several years prior to the State's appropriation.

The State preemptively argues that it did not waive this issue for purposes of appeal when its own expert witness testified regarding the capitalization of income approach to valuation. According to the State, it presented this witness only in rebuttal to the Bishops' witnesses. The State notes that, unlike typical civil cases, the defendant in an eminent domain proceeding bears the burden of proof, and the condemning authority's case at trial is in rebuttal to the defendant's case-in-chief. *See Van Sickle v. Kokomo Water Works Co.*, 239 Ind. 612, 616, 158 N.E.2d 460, 462 (1959); *State v. Anderson*, 170 Ind.App. 443, 445, 352 N.E.2d 805, 806 (1976).

■ Be that as it may, any error in the admission of evidence regarding the income approach to valuation was harmless.[15] It is well established that any error in the admission of evidence is harmless if the same or similar evidence is submitted without objection. *Homehealth, Inc. v. Northern Indiana Public Service Co.*, 600 N.E.2d 970, 974 (Ind.Ct.App.1992). At trial, when Mr. Bishop testified that he used the income approach to reach his opinion regarding the fair market value of the billboards, the State objected. Similarly, the State objected when Mervyn Posner, one of the Bishops' expert witnesses, testified that he based his determination of value upon the income that could be derived from the billboards. However, another of the Bishops' expert witnesses, Robert Sell, also testified that he used the income approach to determine the billboards' value, but the State made no objections. Thus, there is no reversible error.

## III

### Cost to Move

The State claims that the trial court erred when it excluded testimony regarding the cost its expert witness estimated would be required to relocate the billboards to the Bishops' remaining property. Decisions regarding the admission of evidence are within the discretion of the trial court, and we will reverse only upon a

---

was within its discretion to credit the sworn affidavits of Mr. Bishop and his counsel to reflect that extensive time and money had been expended.

14. Capitalization of income is one of three well-recognized methods of determining the fair market value of property. *Lucre Corp. v. County of Gibson*, 657 N.E.2d 150, 153 (Ind. Ct.App.1995), *trans. denied, cert. denied* 519 U.S. 950, 117 S.Ct. 362, 136 L.Ed.2d 253 (1996). Capitalization of income is a method of computation which gives value of the land in relation to the income it produces. *Id. See*

*also State v. Williams*, 156 Ind.App. 625, 297 N.E.2d 880 (1973).

15. By implication, Judge Darden's dissenting opinion reads our majority opinion as an approval of the capitalization of income approach in this case and under these circumstances. If so, it constitutes a misreading of the majority holding. Our holding is, as stated, that "any error in the admission of evidence regarding the income approach to valuation was harmless."

showing of an abuse of that discretion. *Lucre Corp. v. County of Gibson,* 657 N.E.2d 150, 152 (Ind.Ct.App.1995), *trans. denied, cert. denied,* 519 U.S. 950, 117 S.Ct. 362, 136 L.Ed.2d 253 (1996). The trial court abuses its discretion when its decision is clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom. *Id.*

According to the State, the Bishops simply relocated three of the billboards onto the remaining portion of their land. The State claims that the Bishops received full fair market value of the billboards, as if they had been completely taken by the State, and then relocated them—thereby continuing to enjoy the use of the "taken" property. This, the State maintains, amounts to a windfall at the expense of the public.

### A. Personal Property

■ First, we note that the State bases its appellate argument regarding this issue upon the presumption that the billboards in question were moveable personal property. The State's complaint for appropriation of the Bishops' real estate made no mention of personal property, nor did the trial court's order of appropriation. Likewise, the instructions to the court-appointed appraisers made no mention of valuing any of the Bishops' personal property. Nevertheless, the trial court denied the Bishops' efforts to prohibit the State from presenting evidence that the billboards were personal property. If the State were to have been successful with this argument at trial, the cost to remove the billboards would have been irrelevant; in such a case, the Bishops should have received no compensation for billboards which, if personal property, would not have been appropriated.

Be that as it may, the State did not develop such an argument at trial. Instead the State argued that they had indeed appropriated the billboards. The State's argument at trial, aside from arguing that it should be allowed to present evidence of the cost to remove the billboards, focused upon a lower value for the billboards, not that they were personal property for which the Bishops should receive no compensation. Based upon the amount of the jury's award, it is apparent that they did include the fair market value of the billboards in their award, thus concluding that the billboards were "improvements" upon the land, not personal property. *See* Ind.Code § 32–11–1–6(2) (Burns Code Ed. Repl.1995) [16] (requiring compensation for improvements upon land taken by eminent domain).

Upon appeal, the State does not develop its argument in this regard, other than to presume that the billboards were personal property because, according to the State, the Bishops later moved the billboards from the appropriated property. However, as discussed more fully below, the record is unclear with regard to what happened to the billboards in question. Moreover, Mr. Bishop testified that the billboards were set upon a "very thick gauged steel tube ... that's embedded in cement anywhere from fifteen to eighteen feet depending on the type of foundation that you prepare." Transcript at 93. He further testified that the foundations of the billboards were approximately "fifteen foot deep" in the ground. *Id.* He also stated that he used a seventy-ton crane to erect the billboards, and that he intended the structures to be permanent. Therefore, the jury could reasonably conclude that the billboards were improvements

**16.** Now Ind.Code § 32–24–1–9 (Burns. Code Ed. Repl.2002).

upon the land. *See Dinsmore v. Lake Elec. Co., Inc.,* 719 N.E.2d 1282, 1286–87 (Ind.Ct.App.1999) (setting forth the three-part test used in Indiana to determine whether a particular article has become a fixture, and thus, part of the real estate: (1) actual or constructive annexation of the article to the realty, (2) adaptation to the use or purpose of that part of the realty with which it is connected, and (3) the intention of the party making the annexation to make the article a permanent accession to the freehold; also noting that intent is the controlling factor). *See also* 8A Patrick J. Rohan & Melvin A. Reskin, Nichols on Eminent Domain § 23.03[5][a] (3d ed.2002) (noting that in no case found by the authors was a billboard sign which was owned by the owner of the land subject to the eminent domain proceeding held to be removable personal property for which no compensation was due upon the taking of the land, and criticizing one case in which a court held that billboard signs were personal property).

### B. Cost to Move the Billboards

■ The focus of the State's claim is that it should have been permitted to introduce evidence of the cost its expert witness estimated would be required to move the billboards to the residue of the Bishops' property. The statute which governs the determination of the damages in eminent domain actions, I.C. § 32–11–1–6, reads as follows:

"Such appraisers shall take an oath that they have no interest in the matter and that they will honestly and impartially make such assessment. After being so sworn, the judge shall instruct said appraisers as to their duties as such and the measure of the damages and benefits if any they allow. They shall determine and report:

(1) the fair market value of each parcel of property sought to be appropriated, and the value of each separate estate or interest therein;

(2) the fair market value of all improvements pertaining to the realty, if any, on the portion of the real estate to be condemned;

(3) the damages, if any, to the residue of the land of such owner or owners to be caused by taking out the part sought to be appropriated; and

(4) such other damages, if any, as will result to any persons or corporation from the construction of the improvements in the manner proposed by the plaintiff.

In case the land is sought to be taken by the state or by a county, for a public highway or by a municipal corporation for a public use that confers benefits on any lands of the owner, the report shall also state the benefits which will accrue to each parcel of property, set opposite each description of the same, whether described in the complaint or not. In estimating the damages specified in subdivisions (1), (2), (3), and (4), no deduction shall be made for any benefits that may result from such improvement, excepting in case of a condemnation by the state or by a county, for a public highway or by a municipal corporation for public use, the benefits, if any assessed, shall be deducted from the amount of damage allowed, if any, under subdivisions (3) and (4); and the difference, if any, plus the damages allowed under subdivisions (1) and (2) shall be the amount of the award, but in no case shall the damage awarded be less than the damages allowed under subdivisions (1) and (2). *Upon the trial of exceptions to such award by either party a like measure of damages shall be followed.* For the purpose of assessing compensation and damages, the right thereto shall be deemed to have accrued at the date

of the service of the notice provided in section 3 of this chapter, and its actual value, at that date, shall be the measure of compensation for all property to be actually taken and the basis of damages to property not actually taken but injuriously affected, except as to the damages stated in subdivision (4)." (emphasis supplied).

■■■ Here, the Bishops claimed no damage to the residue of their property. As noted by our Supreme Court in *State v. Furry*, 252 Ind. 486, 489–90, 250 N.E.2d 590, 592 (1969), subdivisions (3) and (4) exist in the above statute (then Burns' § 3–1706) for the benefit of landowners in order that they might fully explore the damaging effect of the take upon the entire tract in a partial-taking case. When no claim is made for these classes of damages, the State has no right to introduce evidence of the value of any benefits alleged to have accrued to the residue of the landowner's property. *Id.* This holding follows from the language of Section 6 itself, which states that "in no case shall the damage awarded be less than the damages allowed under subdivisions (1) and (2)." *See id.* If the landowner makes no claim of damages to the residue of his land, there are no damages to the residue from which any benefit to the residue may be deducted.

■■■ Since the Bishops made no claim of damages to the residue of their property, subdivisions (1) and (2) of Section 6 control the issue of the amount of compensation owed them. Subdivision (2) of Section 6 clearly states that the landowners shall receive the "fair market value of all improvements pertaining to the realty, if any, on the portion of the real estate to be condemned." There is no provision in Section 6 permitting the State to introduce

evidence of the cost to remove improvements upon the land condemned. Eminent domain proceedings are statutory, and where the statute fixes a definite procedure it must be followed. *MDM Investments v. City of Carmel*, 740 N.E.2d 929, 932 (Ind.Ct.App.2000) (quoting *Lehnen*, 693 N.E.2d at 582). We must therefore conclude that the trial court did not err in excluding the proffered testimony of the State's expert witness concerning the cost he estimated would be required to move the billboards to the residue of the Bishops' property. *See White v. Cincinnati, Richmond & Muncie R.R.*, 34 Ind.App. 287, 291, 71 N.E. 276, 278 (1904) (holding that the term "land" as used in statutes conferring the power of eminent domain includes both "the soil, and buildings and other structures on it" and that "when there are buildings on the land, they must be paid for as part of the realty, and the cost of their removal forms no part of the damages to be assessed to the landowner"), *trans. denied. But see Hire v. Knisley*, 130 Ind. 295, 29 N.E. 1132 (1892) (where county sought an easement over land to build a highway, landowner was not entitled to both the value and possession of a fence on the subject land, as the easement did not appropriate the fence, and where landowner was paid for taking down the fence and erecting it upon the line of the road, he had no other right to claim compensation).[17]

■■■ The State further argues upon appeal that "it is entirely reasonable for the State to be permitted to make the choice to relocate a billboard where the cost to taxpayers of the relocation will be far less than the cost of a full taking and where the relocation will place the landowner in the same position he or she occupied before

---

**17.** It should be noted that the *White* and *Hire* decisions were decided prior to the adoption of the current eminent domain statutes in 1905.

the taking." Appellant's Brief at 32. The State cites no supporting authority for such a position. In fact, the weight of the authority is against such a proposition. "A condemnor is not permitted to condemn the surface under buildings and require the former owner to move them to another location, and then pay only the costs of the surface plus moving costs." 26 AM.JUR.2D, *Eminent Domain* § 343 (1996). "When improved property is the subject of an eminent domain proceeding, it has been held that absent statutory authorization to the contrary, such improvements may not be excluded from the acquisition. The condemnor must take the land with its permanent improvements and pay for it accordingly, or reject it *in toto.*" 4 JULIUS L. SACKMAN, NICHOLS ON EMINENT DOMAIN § 13.01 (3d ed.2002). *See also* 11A INDIANA LAW ENCYCLOPEDIA *Eminent Domain* § 60 (1998).

More importantly, I.C. § 32–11–1–6 contains no provision authorizing the State to force a landowner to move an improvement off the property to be acquired. Instead, it contains specific instructions that the measure of damages shall include the fair market value of all improvements pertaining to the realty, if any, on the portion of the real estate to be condemned. Therefore, absent any statutory authority, we decline to hold that the State has the power to require a landowner to remove improvements upon land the State seeks to condemn to the residue of the landowner's property in order to lessen the financial impact upon the State.

### C. Windfall

The State maintains that the Bishops moved their billboards from the condemned portion of their land to the remaining portion and, as a result, received a windfall. As noted by our Supreme Court in *Gradison v. State,* 260 Ind. 688, 696, 300 N.E.2d 67, 74 (1973), the theory supporting damages in eminent domain is that a landowner is entitled to just compensation, not a windfall at the expense of the public.[18] To deal with this contention, we must address two issues: (1) what happened to the billboards, and (2) what recourse the State might have if the billboards were removed.

As to the first issue, the State clearly maintains in its brief that "the billboards, in fact, have been relocated on the Bishops' property." Appellant's Br. at 32. The Bishops respond in their brief that, "There is no evidence that the Bishops moved even one sign because it never happened." Appellee's Br. at 29. Unfortunately, the record is not clear as to what happened to the three billboards in question. To support its claim that the Bishops moved the billboards, the State refers us to two documents contained in the record. The first document is a letter dated January 23, 1998, from the Bishops' counsel requesting permission from the State to move the billboards located on the appropriated land. However, this letter was attached as an exhibit to the State's objection to one of the Bishops' motions in limine. The State does not direct us to, and our review of the record does not reveal, that the State ever attempted to introduce this letter into evidence at trial. Moreover, although the letter requests permission to move the billboards, it does not follow from this that the billboards

---

**18.** It should be noted, however, that the *Gradison* Court made this statement in the context of the issue of setting off benefits which accrue to the residue as a result of the taking from the damages to the residue as a result of the taking. *See id.* Here, as set forth above, the Bishops made no claim of damages to the residue of their land from which any benefit thereto could be offset.

were necessarily moved.[19] The other document referred to by the State is a contract between the Bishops and an outdoor advertising company dated May 20, 1998, in which the Bishops agreed to sell "All outdoor advertising structures owned by [SELLER] and formerly located on the property described on Exhibit 2.0 together with all tangible personal property owned by SELLER used in the operation of such outdoor advertising structures (hereinafter referred to as 'Personal Property') which Personal Property shall be conveyed pursuant to the original Bill of Sale which is attached as Exhibit 2.1." Exhibit Book at 1; App. at 236. However, this contract contained no attached exhibits, and the trial court did not admit the document into evidence.[20]

The trial court did not prohibit the State from presenting evidence that the billboards had been removed from the condemned portion of the Bishops' land. The Bishops sought a motion in limine prohibiting the State from introducing evidence that "all or parts of signs located on the real estate subject to the taking was [sic] used elsewhere." App. at 228. To clarify its ruling upon this motion, the trial court explained that the State could "talk about the signs being removed, they just can't say what happened to them...."[21] Transcript at 33. During the State's offer to prove relating to its proffered evidence of the cost to move the billboards, Will Stump, a real estate appraiser who had been hired by the Indiana Department of Transportation, was asked by the State, "Were the signs that were within [the] take area eventually moved back by Mr. Bishop or by a sign company ... ?" Tr. at 287. Mr. Stump responded, "Yes, they were." *Id.* However, upon cross-examination, Mr. Stump was asked, "Now you indicate[d] that the signs were moved back, true?" *Id.* at 293. Mr. Stump replied, "I don't know that I testified about that. I ... think I said it would have been possible to move the signs back." *Id.* Mr. Stump then continued, saying, "I think what actually happened is that they built new signs for all practical purposes." *Id.* Mr. Stump also testified that, although he had a written estimate of the cost to move the billboards, "I think they actually built new signs when they made the deal with [the outdoor advertising company]." *Id.* at 294. The State could have, but did not,

---

**19.** Although not cited by the State, our review of the record also reveals a fax from the Bishops' counsel to the State requesting that the Bishops be allowed to "have the signs if they pay for the removal." App. at 269. Another fax from the Bishops' counsel requests that one of the issues "to be dealt with" was "[t]he State's agreement that the land owner may remove the existing signs." App. at 271. The record also contains a letter from the Attorney General's office to the Bishops' counsel in response to the Bishops' request to move the billboards. This letter indicates that one of the four billboards on the land involved in the taking was unable to be moved. According to this letter, the two billboards on the north side of the highway "must be relocated," and one of the two billboards on the south side "must be relocated." App. at 273. In addition, in the Bishops' response to the State's opposition to their motion in limine, the Bishops, countering the State's claim that three billboards had been relocated, claimed that *"[p]arts* of two signs were used to erect signs on the Bishops' residual property. The third sign was completely not used. It was the sign company and not the Bishops who moved parts of the two signs." App. at 142. Exactly which "parts" of the billboards were used is unclear.

**20.** The State makes no argument that the trial court erred by not admitting this exhibit into evidence.

**21.** The State makes no argument that the trial court erred with regard to this ruling. Instead, it focuses solely upon the exclusion of the evidence regarding the *cost* it estimated would be required to move the billboards to the residue of the Bishops' property.

present any other evidence that the billboards were moved from the condemned land. Therefore, we cannot assume, as does the State, that the billboards were moved from the Bishops' property.

■ Nevertheless, assuming for purposes of argument that the billboards were moved, it would then appear that the Bishops maintained control over property for which the State was required to pay fair market value. The question would then become what is the State's proper recourse when improvements are removed from the condemned land. Neither party cites any Indiana case regarding this issue, and our research has revealed none. Some jurisdictions have held that the value of improvements wrongfully taken from the acquired property should be deducted from the award granted. *See Clark v. United States,* 155 F.2d 157, 163 (8th Cir.1946); *United States v. Vater,* 259 F.2d 667, 674 (2d Cir.1958); 26 Am.Jur.2d *Eminent Domain* § 343 (1996) ("The value of property which can be, and is, removed is retained by its owner and does not become an element in the compensation to be paid.").

■ Indiana Code § 32–11–1–6 contains no provisions for deducting the value of improvements which are removed from the condemned land. Section 6 states that the amount to be awarded to the landowner must include the value of improvements upon the condemned land. Section 6 is also clear that in no case shall the damage awarded be less than the damages allowed for the fair market value of each parcel of land sought to be appropriated and the fair market value of the improvements pertaining to the portion of land sought to be appropriated. It further reads:

"For the purpose of assessing compensation and damages, the right thereto shall be deemed to have accrued *at the date of the service of the notice* provided in section 3 of this chapter, *and its*

*actual value, at that date, shall be the measure of compensation for all property to be actually taken* and the basis of damages to property not actually taken but injuriously affected, except as to the damages stated in subsection (4)." I.C. § 32–11–1–6 (emphasis supplied).

Thus, the effective date for purposes of assessing damages is the date the service of notice was provided to the landowner of the filing of the complaint for appropriation. *State v. Church of the Nazarene of Logansport,* 268 Ind. 523, 526, 377 N.E.2d 607, 608 (1978). Here, the chronological case summary indicates that the Bishops received such notice on December 9, 1996. If the billboards had been removed prior to this date, then they would form no part of the compensation to be awarded to the Bishops, as they would not be improvements pertaining to the realty as of that date.

We further note that I.C. § 32–11–1–7 states that the condemning authority takes possession and interest of the subject land when it deposits with the clerk of the court the amount assessed by the appraisers. *See State ex rel. City of Hammond v. LaPorte Circuit Court,* 249 Ind. 494, 497, 233 N.E.2d 471, 472 (1968) (where State paid to the trial court clerk the amount of the appraisers' award, it could deprive the landowners of the use of their land). Here, the State deposited this amount on January 27, 1998.(A 8). Thus, there is a period of time between the effective date for determining damages under Section 6 and the date the condemnor takes possession and interest to the land under Section 7. Between these dates, the condemning authority would appear to have no power to stop a landowner from removing improvements from the land at issue, as possession and interest will not yet have passed to the condemnor. Yet the condemnor would still be required by Section

6 to pay for such improvements as of the date of the service of notice. This would appear to allow a seemingly absurd result under some circumstances, such as those alleged by the State in this case. However, as noted above, eminent domain statutes fix a definite procedure which must be followed. *MDM Investments*, 740 N.E.2d at 932; *Lehnen*, 693 N.E.2d at 582. Any potential inequity which may result from a given situation must be resolved by the General Assembly, not this court.[22]

If the billboards were moved after the date the State took possession and interest in the condemned land, Section 6 still contains no provisions allowing the State to deduct the value of any improvements removed. It was held in *Public Service Co. of Indiana v. City of Lebanon*, 221 Ind. 78, 46 N.E.2d 480 (1943), *trans. denied*, that, in determining damages under the Eminent Domain Act, the trial court has jurisdiction to conduct further proceedings after the damages have initially been determined. In *Public Service Co.*, the city commenced an action to condemn the electric utility system of the utility company.[23] Following a trial on exceptions to the appraisers' report, the trial court entered judgment in favor of the utility in the amount of $210,000, which was affirmed by the Indiana Supreme Court. After an unsuccessful attempt by the utility to appeal to the United States Supreme Court, the city paid to the trial court clerk the amount of the original judgment and demanded the property from the utility. In the time between the original judgment and the city's tender of the cash to the clerk, however, the utility had been required to make changes, additions, extensions, and improvements to the system, which were inseparable from the system, and which cost the utility in excess of $50,000. The city filed an action claiming the utility was interfering with its right to possession. Upon appeal, the city claimed that, having paid the price required by statute, it was entitled to unqualified possession of the property condemned, and that if the utility had any claim for the value of additions made, it could prosecute an action for damages. The utility claimed that requiring it to sue for damages amounted to a taking without compensation.

Our Supreme Court noted that the Eminent Domain Act provided that the trial court "may make such further orders, and render such findings and judgment as may seem just."[24] *Public Service Co.*, 221 Ind. at 86, 46 N.E.2d at 483. The Court held that the purpose of this provision was to enable the trial court to meet any contingency or situation that might arise, and to provide for full and just compensation to the owner of all the property, including extensions, additions, and capital expenditures made after the proceedings were commenced. *Public Service Co.*, 221 Ind. at 86–87, 46 N.E.2d at 484. The Court held that this power should be exercised in such a manner that a landowner may not be deprived of any of his or her property without due process of law, and that the utility was not required to assume the burden of prosecuting an independent action in damages to recover the value of

---

22. The recodification of the eminent domain statutes noted above does not address this issue.

23. The Court in *Public Service Co.* held that, although the rights of the city and the utility were to be determined under the Shively Spencer Act of 1913, this Act had been amended in 1933 to provide that compensation was to be determined in accordance with the Eminent Domain Act. 221 Ind. at 86, 46 N.E.2d at 483.

24. Similar language is found in I.C. § 32–11–1–8.

improvements which were reasonably necessary for the maintenance and function of the electrical system condemned by the city. *Public Service Co.,* 221 Ind. at 88–89, 46 N.E.2d at 484.

At first glance, this opinion seems to support the notion that the trial court has some flexibility in determining the proper amount of damages to be awarded in an eminent domain action. However, in *Public Service Co.,* the landowner sought to increase the award required under the applicable eminent domain statute. Here, to decrease the amount awarded would run contrary to the plain language of I.C. § 32–11–1–6, which states that the amount awarded shall not be less than the fair market value of the land and improvements pertaining to the realty as of the date of service of notice of the complaint for appropriation. We can see no way in which the value of the billboards could be deducted from the award without running afoul of the unambiguous language of Section 6.

■ Still, we do not believe the State is without recourse. A similar situation was faced by the Pennsylvania Supreme Court in *Dyer v. Commonwealth,* 396 Pa. 524, 152 A.2d 760 (1959), wherein one of the improvements upon the condemned portion of the landowners' tract was a multiple dwelling which was subsequently relocated by the landowners to a portion of their land which was not subject to condemnation. The Commonwealth argued that the value of the moved dwelling should be deducted from the amount awarded to the landowner. The *Dyer* court rejected this argument. Pursuant to the then-effective Pennsylvania statute, the proper measure of damages was the difference in the value of the condemned land, including the improvements, immediately before and immediately after the taking. The *Dyer* court wrote, "such right to

compensation was not subject to qualification by the fact that between the time of taking and the time of actual construction of the limited access highway the multiple dwelling had been removed to another location on the uncondemned portion of their land." 396 Pa. at 528, 152 A.2d at 762. The Commonwealth in *Dyer,* as the State does here, argued that the result of such a rule forced it to pay the value of the improvement and at the same time permit the landowner to retain the improvement itself. To this the *Dyer* court responded:

> "The Commonwealth, however, does not lack a remedy in this situation. The owner-appellees are subject to an action in trespass for the removal of the multiple dwelling, title to which had been acquired by the Commonwealth. Furthermore, if, as the owner-appellees contend, the Commonwealth had agreed to the removal of the building—denied by the Commonwealth—the Commonwealth would have an action for the fair value thereof." 396 Pa. at 528–29, 152 A.2d at 763.

The same is true in the case at bar. If the Bishops entered without permission upon the land after the State took possession and interest therein and removed in part or in whole the improvements thereon, the State might have an action against the Bishops for trespass and/or conversion. If the Bishops did the same with the State's permission, the State might then have an action for the value of the property taken, or should have demanded compensation for the property taken before giving the Bishops such permission. This would offset any alleged windfall without deducting the value of the property allegedly moved from the award required by I.C. § 32–11–1–6.

In sum, the trial court did not err in excluding evidence of the estimated cost required to remove the billboards, nor

does the State have the authority to require landowners to remove improvements upon realty acquired by the State through eminent domain. However, the State may not be wholly without remedy with regard to any windfall allegedly received by the Bishops.

### Conclusion

The trial court did not abuse its discretion in denying the State's motion to withdraw its exception to the report of the court-appointed appraisers. The State has failed to preserve the issue of the propriety of evidence regarding the capitalization of income method for determining fair market value of the billboards. The trial court did not err in excluding evidence of the estimated cost to remove the billboards to the Bishops' remaining property.

The judgment of the trial court is affirmed.

BAKER, J., concurs.

DARDEN, J., concurs in part and dissents in part with separate opinion.

DARDEN, Judge, concurring in part and dissenting in part.

I agree with the majority's conclusion that the trial court did not abuse its discretion when it denied the State's motion to withdraw its exceptions.

However, I respectfully disagree with the majority's conclusion approving the method used for determining the compensation due to the Bishops for the property condemned by the State. I find no error *per se* in the use of a capitalization of income method to determine fair market value in a condemnation case. However, I cannot agree with its use in this case. In determining the proper compensation due

to a landowner from whom the State has appropriated land for a highway project, the fair market value is calculated as of "the date of the appropriation." *State v. Maplewood Heights Corp.*, 261 Ind. 305, 302 N.E.2d 782, 785 (1973). Undisputably, that date here was December 6, 1996. According to the State, on December 6, 1996, not a single one of the four billboard structures on the appropriated land was being leased or exhibited any advertisement.[25] Apparently these billboards had not generated income for several years. Therefore, I find use of the capitalization method to be inappropriate here, where it was used to capitalize billboards that lacked an on-going business record at the time of the appropriation. *See J.J. Newberry Co. v. City of East Chicago*, 441 N.E.2d 39, 43 (Ind.Ct.App.1982) (where business not being operated "as a going concern" at the time of the condemnation, capitalization of income method is "too speculative" to compute the fair market of the property). Further, the inappropriate use of the capitalization method here is compounded by the use of a capitalization date of 1998. The result, in my opinion, was a value for compensation that constituted a windfall to the property owners and an unfair expenditure of taxpayer dollars.

I further believe that the trial court erred when it disallowed evidence of the "cost to cure," whereby the fair market value of the real estate appropriated would have included the cost of moving the billboards to land retained by the Bishops. The majority notes certain deficiencies in the State's advocacy that led to the fact the jury did not learn about the continued use of the billboards. Legal strategy aside, I cannot overlook the fact that the Bishops did not lose their four billboards;

---

**25.** The Bishops concede that "for a number of years prior to the taking, space on the structures were not rented." Bishops' Br. at 8.

353

they lost one, and the other three were moved. In my opinion, the State's obligation to compensate landowners for property taken for public use does not include compensation for property that the landowners did not lose. Accordingly, I dissent as to Issue II and Issue III and would reverse the judgment of the trial court and order a new trial.